TERRY, administrator, *v.* BROWN *et al.*

1. This case, so far as it relates to the rejection of certain evidence in regard to pedigree, is in principle controlled by the decision in *Greene* v. *Almand,* 111 *Ga.* 735 (36 S. E. 957), which, having been concurred in by all the members of the court, is binding until reversed or modified.
2. After the rejection of the evidence referred to in the preceding headnote, there was no error in granting a nonsuit.

JULY 20, 1914. REHEARING DENIED AUGUST 18, 1914.

Complaint for land. Before Judge Hawkins. Worth superior court. April 30, 1913.

*N. A. Morris, J. J. Forehand, J. H. Tipton,* and *George D. Anderson,* for plaintiff.

*I. A. Bush, C. W. Monk,* and *Pope & Bennet,* for defendants.

LUMPKIN, J. In 1905 Terry, as administrator of William Hadaway, deceased, brought an action against James Brown and G. A. Horkan, to recover a certain lot of land. The land was granted in 1837 to Wilson Hadaway's orphans, the grant containing a recital that the land had been drawn by such orphans, of Bryant's District, Wilkes County. The plaintiff's case depended on showing that William Hadaway was the only son of Wilson Hadaway, and therefore took the land under the designation above stated. Evidence was offered to show certain statements of William Hadaway's mother, since deceased, to the effect that she was the widow of Wilson Hadaway, who had died a number of years before; that William Hadaway was his only child, and that they were living in Wilkes county at the time of the death of Wilson Hadaway. Evidence of certain statements of William Hadaway, while in life, tending to show that he was the son of Wilson Hadaway, were also offered. These statements, though made before any controversy

arose, were rejected. At the close of the evidence introduced on behalf of the plaintiff, a nonsuit was granted, and the plaintiff excepted.

1. The ruling of the trial court in regard to the rejection of evidence is controlled by the decision in *Greene* v. *Almand,* 111 *Ga.* 735 (36 S. E. 957). That decision was concurred in by all of the Justices of this court, and, under the statute (Civil Code (1910), § 6207), it is binding until overruled or modified with the concurrence of six Justices.

Speaking for himself, the writer is of the opinion that, in applying a correct general principle, that decision fell into error, and is contrary both to sound reason and to the great weight of authority. It is true that a similar ruling is made in Blackburn *v.* Crawfords, 70 U. S. 175 (18 L. ed. 186). But, with great respect to that high court, the decision mentioned does not seem to be well grounded, to the extent to which it appears to go; and it has been criticised. In Fulkerson *v.* Holmes, 117 U. S. 389 (6 Sup. Ct. 780, 29 L. ed. 915), a recital, in an ancient deed, of the death intestate of a former owner of land conveyed by it, and that the grantor in the deed was his only son and heir, and conveying the land to a person under whom a party to the action claimed, was held to be admissible in evidence, after the lapse of over sixty years, in order to prove the pedigree of the son, who died after making the deed. The decision in Blackburn *v.* Crawfords, supra, was not directly modified, but it was held that the similarity of names, and the fact that the patent issued to the former owner was found with the papers, was sufficient evidence of relationship to him to authorize the admission of the grantor's statements.

The rule as to proof of pedigree is thus stated in the Civil Code (1910), § 5764, and was likewise contained in previous codes: "Pedigree, including descent, relationship, birth, marriage, and death, may be proved either by the declarations of deceased persons related by blood or marriage, or by general repute in the family, or by genealogies, inscriptions, 'family trees,' and similar evidence." This did not arise from a legislative enactment, but from a codification of the general rule. Where statements of deceased persons are offered in evidence on the subject of pedigree, it is of course a general rule that there must be some extrinsic evidence that such declarant was related to the family; but where the question is

whether any, or what, relationship exists between two supposed branches of the same family, it is sufficient to establish the connection of the deceased declarant with either branch, in order to render such declaration admissible. Relationship is mutual; and the question of whether "A" is related to "B," or a member of "B's" family, also involves the question whether "B" is related to "A," or is a member of "A's" family. Where the question is whether "A" and "B" are related, it is just as competent to prove that "A's" circle of relationship includes "B" as to prove that "B's" circle of relationship includes "A." Proof of pedigree by statements of deceased relatives, and reputation in the family, is recognized as an exception. to the hearsay rule, based on necessity. Where the question is whether a person now living is related to or descended from another, dead for many years, perhaps a century or more, to hold that, before declarations of deceased persons could be admitted in evidence, their relationship to the dead person with whom it is sought to connect the living person must be shown, and that it is not sufficient to show the relation of the declarant to the living person, would often be practically destructive of the rule itself, and would be to disregard the basis on which the rule is founded. If it should be held that there must be evidence of the relationship of the deceased declarant with both families, or branches, then there would be no need for the declaration to be admitted, because the evidence required as a basis for the admission of the declaration would show the very thing to prove which the declaration would be admissible.

In Blackburn v. Crawfords, supra, Mr. Justice Swayne quoted from the opinion of Lord Brougham in Monkton v. Atty. Gen., 2 Russ. & Myl. 147, 156. But, in the same case, Lord Brougham said: "I can not go to the length of holding that you must prove him to be connected with both the branches of the family touching which his declaration is tendered." (The original report is not accessible to the writer at this time, but the quotation made is copied in several text-books and opinions.) It is illogical to hold that pedigree must be proved by starting at the top and coming downward, instead of by starting at the bottom and going upward. In *Green* v. *Almand,* supra, several of the authorities cited in support of the decision, when thoroughly considered, do not, in the opinion of the writer hereof, sustain it. It may be remarked that

in the second edition of one of the works cited (18 Am. & Eng. Enc. Law (1st ed.), 260) the rule is stated substantially as here contended, as to two supposed branches of a family. 22 Am. & Eng. Enc. Law (2d ed.), 643.

In 3 Wigmore on Evidence, § 1491, it is said: "It follows, in applying the foregoing principle, that where an alleged relationship between Doe and Roe is to be testified to, a relation of Doe may speak to it, because it concerns the relationships of Doe's family, while a relation of Roe may equally speak to it, because it concerns the relationships of Roe's family; hence, all that is required of the declarant is a connection with either one or the other, but not with both. . . Any other rule would produce this singular inconsistency, that if in 1863, Doe and Roe being both poor, Doe's son James mentions Roe in a letter as his father's cousin, and then dies in 1864, and if in 1884 litigation arises and James is proved to be the son of Doe, his letter would be received if Doe had become the wealthy one and Roe's relatives were claiming a share, but would be rejected (without other proof) if Roe had happened in the meantime to become the wealthy one and Doe's relatives were seeking a share. Yet this seems to be the logical consequence of the doctrine laid down by the Federal Supreme Court." In Sitler v. Gehr, 105 Pa. St. 577 (51 Am. R. 207), Paxson, J., discusses the authorities at length, and reaches a like conclusion. See also 2 Taylor on Ev. § 640; 1 Gr. Ev. (16th ed.) § 114c; Eaton v. Tallmadge, 24 Wis. 217.

There are some limitations upon the admissibility of such declarations. Lord Eldon's statement in Whitelocke v. Baker, 13 Ves. 514, that declarations in the family, and descriptions in wills, upon monuments, and in Bibles and registry books, are admitted "upon the principle that they are the natural effusions of a party who must know the truth, and who speaks upon an occasion when the mind stands in an even position, without any temptation to exceed or to fall short of the truth," has often been quoted. Such declarations must be made ante litem motam, that is, before any controversy. Perhaps actual controversy may not be necessary to exclude such evidence, if there is any specific and adequate reason to attribute an unfair or insincere motive to the declarant in making the declaration. But this does not change the general rule of admissibility, or the fact that most declarations of deceased members

of a family, or reputation in a family, may to a greater or less extent affect inheritances, or the like. Though evidence may be admissible, it is not necessarily conclusive. Its weight is matter for further consideration. An interesting discussion of the basis of the rule, the circumstantial guarantee of trustworthiness, the limitations, and the testimonial qualification of witnesses, will be found in 2 Wigmore on Ev. §§ 1481 et seq., and cases there cited.

The writer of this opinion has extended somewhat his observation in regard to the rule, because he is of the opinion that it is an important one affecting inheritances, and proof of family connections, and that at some time the case of *Greene* v. *Almand,* 111 *Ga.* 735, should be reconsidered. While the general statement that a deceased declarant must be shown to be related to the family, in order to admit his declaration in evidence, is correct, the application of that rule so as to require proof that the declarant must be related to the person with whom it is sought to connect the plaintiff, and that it is not sufficient to show his relationship to the plaintiff, though speaking ante litem motam, should be reviewed.

In the present case, the action being brought by the administrator of William Hadaway, objection to statements of the intestate as self-serving could be urged with greater force than to those of the other declarant. See, in this connection, *Drawdy* v. *Hesters,* 130 *Ga.* 161 (60 S. E. 451, 15 L. R. A. (N. S.) 190).

It was contended that the excluded evidence, or some of it, was admissible on the subject of identity as well as pedigree, and that some of it was admissible as family tradition. The real question involved was not the identity of two named persons, but the pedigree of the plaintiff. Identity, if involved at all, was only incidentally so. The evidence was offered and rejected in bulk. References in the testimony of certain witnesses to family history appear to have related to statements of William Hadaway, the intestate, whose administrator was the plaintiff, and of his mother, and perhaps of his children. The two witnesses parts of whose testimony were rejected were a son of the intestate and a son-in-law who was his administrator bringing the suit. The evidence was excluded as a whole, and, under the decision of this court above cited, most, if not all, of it was inadmissible; and a reversal can not be granted on that ground.

2. Exception was taken to the grant of a nonsuit. After the

evidence above mentioned had been excluded, substantially all that remained tending to make out a prima facie case was evidence that in 1837 the State granted the land in dispute to "Wilson Hadaway's orph's of Bryant's District, Wilkes County, their heirs and assigns, forever;" that William Hadaway died in 1899, and the plaintiff later was appointed his administrator; and certain entries in a family Bible, and testimony connected therewith, which were admitted without objection. In regard to this Bible, John F. Hadaway, a son of William Hadaway, who stated that he was sixty-eight years old, testified as follows: "This book that you now present to me is a Bible, a family Bible. It was the family Bible at the time of my father's death; this [identifying and referring to certain pages in the book] is the family history and record; this was the family Bible prior to the death of my father. I first saw this writing in this Bible. I can't tell you exactly when—a good while ago. That is my father's family Bible; my sister has had it; she took it and kept it with her; she took it in 1899. I could not tell you who made these entries in that Bible; I don't know who made them; my father could not write. I do not know the handwriting in that book. I don't know when I first saw this handwriting in this book. I know it is the family record of the family." The witness further testified that, to the best of his recollection, he had seen the entries in the Bible in relation to his father's birth and marriage and the names of the children a number of years before the death of his father,—perhaps thirty or forty years. On the first page of the Bible, under the head of "Births," the first entry was, "William Hadaway, son of Wilson and Aley Hadaway, was born November 9, A. D. 1812." The next was, "Nicey C. Hadaway, wife of William Hadaway, was born March 17, A. D. 1814." Then followed entries relating to other persons, apparently children and a second wife of William Hadaway.

The family Bible did not purport to be that of Wilson Hadaway, or to contain entries in regard to his birth, marriage, or children. It was the family Bible of William Hadaway, and its first entry related to him alone. Assuming that it had probative value to show that William Hadaway was the son of Wilson Hadaway, it did not show that he was the only son. It went no further than to operate as evidence that he was one of the persons falling within the description, "Wilson Hadaway's orph's." In order to recover, it was

incumbent on him to show either that he was the only orphan of Wilson Hadaway, so as to be entitled to recover the entire land, or how many of such orphans there were, so as to show what undivided part of the land he owned. *Dupon* v. *McLaren,* 63 *Ga.* 470 (2).

Accordingly there was no error in granting a nonsuit.

*Judgment affirmed. All the Justices concur.*