## WILSON v. THE STATE.

No. 8250.   JULY 16, 1931.   REHEARING DENIED SEPTEMBER 17, 1931.

*B. F. Walker, J. C. Newsome,* and *E. P. & J. Cecil Davis,* for plaintiff in error.

*George M. Napier, attorney-general, M. L. Felts, solicitor-general, T. R. Gress, assistant attorney-general,* and *J. B. & T. R. Burnside,* contra.

HINES, J. (After stating the foregoing facts.)

█ The defendant in any criminal case in the superior court may move for a change of venue, whenever in his judgment an impartial jury can not be obtained to try him in the county where the crime was committed. He has the right to except to the ruling denying him a change of venue, in which event he shall present to the judge his bill of exceptions within six days after the refusal of the judge to grant him a change of venue. The bill of exceptions must be filed in the office of the clerk of the superior court in the county of the alleged crime, within two days after being signed by the judge; and the clerk shall transmit the bill of exceptions and the necessary record in the case to the Court of Appeals as early as possible, not exceeding ten days from the filing of the bill of exceptions in his office. Penal Code, § 964; Ga. L. 1911, p. 74; 6 Park's Code, § 964; Ga. L. 1916, p. 19; 10 Park's Code Supp. 1922, § 6502; *Ruffin* v. *State,* 151 *Ga.* 743 (108 S. E. 29) ; *Scoggins* v. *State,* 24 *Ga. App.* 677 (102 S. E. 39) ; *Ruffin* v. *State,* 28 *Ga. App.* 40 (110 S. E. 311). Under the above statutory and constitutional provisions, the only method of reviewing the refusal to grant a change of venue is by direct bill of exceptions to the Court of Appeals. The remedy by exceptions pendente lite, and the assignment of error thereon when a final bill of exceptions is brought, after conviction of a defendant, to review the judgment of the trial judge overruling a motion for new trial, does not exist; and since such method to review the ruling denying the change of venue was adopted, this court is without jurisdiction to hear and pass upon any assignments of error based upon such exceptions pendente lite.

█ On the trial of the defendant for the murder of the deceased, W. Lee Kitchens, a witness for the State, testified that around eight, eight-thirty, or nine o'clock on the night of the homicide, he was at the home of Mrs. English, that she and one of her daughters and the defendant were engaged in a water-pouring

contest, that they finally became enraged and got into a fight, and that the defendant in this fight knocked Mrs. English down, and then knocked her daughter down. The defendant moved to rule .out this evidence, upon the ground that it was too far removed from the homicide to be a part of the res gestæ, that this difficulty was one between the defendant and these women and not one between the deceased and the defendant, and that this difficulty was not connected with the homicide in any way. The judge refused to rule out this evidence. It is urged that the judge erred in refusing to rule out this evidence, because it was not a part of the res gestæ and was not connected with the homicide in any way, and because it was improper to admit evidence of the commission of one crime upon the trial of the defendant for a separate and distinct offense. Is this contention well founded? Evidence of the commission of one crime is not admissible upon the trial of the defendant for another crime, where the sole purpose is to show that the defendant is guilty of such other crime. Where one is on trial charged with the commission of a crime, proof of a distinct and independent offense is never admissible, unless there is some logical connection between the two, from which it can be said that proof of the one tends to establish the other. To this general rule there are some exceptions; as, when the extraneous crime forms part of the res gestæ; or is one of a system of mutually dependent crimes; or is evidence of guilty knowledge; or may bear upon the question of the identity of the accused or articles connected with the offense; or is evidence of prior attempts by the accused to commit the same offense upon the victim as that for which he stands charged; or where the proof of the extraneous crime tends to prove malice, intent, motive, or the like, if such an element enters into the offense charged. *Cawthon* v. *State,* 119 *Ga.* 395 (46 S. E. 897); *Frank* v. *State,* 141 *Ga.* 243 (80 S. E. 1016); *Williams* v. *State,* 152 *Ga.* 521 (110 S. E. 286); *Coart* v. *State,* 156 *Ga.* 536 (119 S. E. 723); *Booth* v. *State,* 160 *Ga.* 271, 274 (127 S. E. 733). In order that a collateral crime may be relevant as evidence, it must be connected with the crime under investigation as part of a general and composite transaction. *Booth* v. *State,* supra. On the trial of a defendant charged with murder it is competent to give in evidence all that was done by the defendant at the time of the killing, and which constitutes a part of the entire transaction. *Reese* v. *State,*

7 *Ga.* 373. In that case the defendant went to the house of one Gerganus, the father of the deceased, with whom the deceased was living, and made use of insulting and abusive language to the deceased. The father went out to the gate to the defendant, and said to him, "What are you coming here interrupting us for; we interrupt nobody?" As soon as this remark was made the defendant knocked the father down with his gun; whereupon the deceased, who was standing in the piazza, ran out to her father, and the defendant raised his gun and shot her dead. This court held that the evidence of the assault upon the father was admissible on the trial of the defendant for the homicide of his daughter, as a part of the entire transaction, and as evidence of the innate depravity and malicious intentions of the defendant.

Does the admission of the evidence complained of come within any of the exceptions to the general rule which excludes proof of one crime upon the trial of a defendant for another crime? If the assaults committed by the defendant upon Mrs. English and her daughter and the homicide constitute separate and distinct transactions, the former having no connection with the latter, and if these assaults were not connected with the crime for which the defendant is charged, as part of a general and composite transaction, then the admission of this evidence was illegal and improper. If the facts and circumstances attending these assaults and the facts and circumstances attending the killing comprise one continuous transaction, then proof of the facts and circumstances attending the assaults was proper and admissible upon the trial of the defendant charged with the homicide. The facts and circumstances attending the commission of the assaults must be immediately connected in some way with the homicide, and thus must tend to explain it. *Helms* v. *State,* 138 *Ga.* 826 (76 S. E. 353). According to the testimony of W. Lee Kitchens, the defendant and the deceased were quarreling at the home of Mrs. English on the night of the homicide, about nine-thirty o'clock. Mrs. English and the defendant "argued a little bit." They began pouring water upon each other, and finally became angry and engaged in a fight. The defendant knocked Mrs. English down. Ruth, a daughter of the latter, tried to run the defendant off. He then knocked her down. The deceased seems to have come to the assistance of Mrs. English. The defendant then pulled out his pistol, saying "The son of a b—

that doesn't like it, step out." Kitchens then left the scene of the difficulty. When he left, the deceased was standing at Mrs. English's head, trying to help her up. While the above remark was not addressed to any one by name, it is fair inference that it was intended for the deceased. At first blush it might seem that the fight between the defendant and Mrs. English was a separate and distinct crime or offense, and had no connection whatever with the subsequent killing of the deceased by the defendant. It may be urged that the fact that Mrs. English and the defendant were engaged in pouring water upon each other, that this sport resulted in their becoming enraged, and that they engaged in a fight as a result of the anger thus created, was in no way connected with the killing of the deceased by the defendant, although the homicide followed shortly after this difficulty. If nothing more appeared from the evidence to connect this fight between Mrs. English and the defendant with the homicide, or to explain and throw light upon the subsequent killing of the deceased by the defendant, evidence of such previous fight would be inadmissible upon the trial of the defendant for the homicide; but there are facts and circumstances which go to show that at the time of this fight there was bad feeling between the deceased and the defendant. Shortly before this fight Mrs. English and the defendant went over to the home of the deceased, in order to induce a daughter of Mrs. English to leave the home of the deceased and return to the home of the mother. There are facts and circumstances in the evidence which might authorize the jury to find that this produced bad blood between the deceased and the defendant. Again, when the defendant knocked Mrs. English down, the deceased came to her help. He was trying to help her up. This might have angered the defendant, and added to his previous ill feeling towards the deceased. Furthermore, the jury would be authorized to find that the above language used by the defendant was meant for the deceased; and that this language, taken in connection with the drawing of the pistol by the defendant, showed the existence of bad feeling by the defendant towards the deceased. The existence of such bad feeling on the part of the defendant towards the deceased was relevant to show malice and motive on the part of the defendant in killing the deceased. As we have seen, one of the exceptions to the general rule that proof of another offense is not admissible on the trial of a

defendant charged with the commission of a crime exists when evidence of such other crime tends to show malice or motive for the crime for which the defendant is on trial. So we are of the opinion that the above evidence was relevant both because it was a part of the res gestæ of the entire transaction, and because the same tended to establish the animus of the defendant and to show a motive for the homicide.

■ The defendant moved for a new trial upon the ground that George Hattaway, who was a member of the jury which convicted him, was disqualified because he was related to David Dixon, the reputed father of the deceased, within the ninth degree. In support of this ground the defendant introduced the affidavit of W. S. Bales tending to prove the existence of this relationship. In rebuttal, the State introduced the affidavit of David Dixon, in which he deposed that he was not the father of the deceased, that there was no relationship between him and the deceased, that he was familiar with the history of his family from actual knowledge and also by reputation in the family, and that there is no relationship between him and this juror. The defendant objected to this affidavit, upon the grounds that the statements therein were irrelevant, and that the fact as to whether affiant was the father of the deceased was not under consideration, as the court, upon the call of the case for trial, had stated that any one related within the prohibited degree to affiant would be disqualified from serving on the jury, and it thereby became the law of the case that relationship to affiant disqualified a juror from serving in the case, regardless of whether affiant was the father of the deceased or not. These objections are without merit. The statements therein were not irrelevant. These statements tended to show that there was no relationship between David Dixon and the juror, Hattaway. This was clearly relevant to the issue raised by the defendant. It is further contended that the statement made by the judge upon the call of the case for trial, that any one related within the prohibited degree to David Dixon would be disqualified from serving on the jury, became the law of the case, and that in consequence relationship to David Dixon disqualified a juror from serving in the case, regardless of the fact whether Dixon was the father of the deceased or not. We do not think that this position is well taken. This statement of the judge did not become the law of the case, and did

not preclude the State from showing that Dixon was not the father of the deceased, and that for this reason a juror related to Dixon was not disqualified to try the case. When the defendant undertook to show that the juror was related to Dixon, and for that reason was disqualified to try this case, the above statement of the judge furnishes no valid reason why the State could not reply by disproving the fact of such relationship.

■ In further rebuttal of this ground, the State introduced the affidavit of Gray Bales, who deposed that he is a son of W. S. Bales, that the latter suffered a stroke of paralysis more than a year before the trial, since which time his mind has not been clear and at times is very bad, that his father has made conflicting statements relative to said relationship, that his father is not clear in his mind as to said relationship, and that in his opinion his father is not competent to act as a witness in this or in any other case. The defendant objected to this affidavit, upon the grounds that affiant did not state that W. S. Bales was not clear in his mind at the time his affidavit was procured, that he only stated in his opinion that W. S. Bales was incompetent to act as a witness, that affiant nowhere stated that he was an expert on the mind and condition of W. S. Bales, and did not give any grounds on which to base his opinion, and that affiant nowhere contradicted the facts testified to by W. S. Bales as to the relationship of David Dixon and said juror; for which reason said affidavit had no probative value as to the relationship of said juror. The first objection is that the affidavit does not state that the mind of W. S. Bales was not clear at the time he made it. This objection is not well founded. Affiant states that his father suffered a stroke of paralysis more than a year before, and that since that time his mind has not been clear, but at times it was very bad. The range of time thus fixed embraces the time when this affidavit was made by W. S. Bales. So affiant, in effect, stated that his father's mind was not clear at the time he made his affidavit. The next objection is that affiant only stated that in his opinion W. S. Bales was incompetent to act as a witness, and nowhere stated that he was an expert on the mind or condition of W. S. Bales, and did not give any ground on which he based such opinion. Mental incapacity can be shown by others than experts, provided they state the facts upon which their opinions are based. Affiant stated these facts. They were that his father

had suffered a stroke of paralysis more than a year before, in consequence of which the mind of his father had not been clear, and at times was very bad, and that his father had made conflicting statements relative to said relationship. On these facts affiant based his opinion that his father was incompetent to testify, on account of the enfeebled condition of his mind. So we are of the opinion that the objections urged against the admission of this affidavit were not well taken. This affidavit was offered, not for the purpose of disproving the facts stated in the affidavit of W. S. Bales, but for the purpose of showing that he was mentally incompetent to testify. The weight of his opinion, based upon the facts set out in his affidavit, was for determination by the judge.

■ The defendant moved for a new trial upon the ground that Levi Kitchens and Morris Kitchens, two of the jurors who returned a verdict finding him guilty, were disqualified to try him, because they were related within the eighth degree to J. H. Wilcher, the prosecutor in the case. He introduced, on the hearing of the motion, the affidavits of various persons showing such relationship of these jurors. The State undertook to rebut the evidence of this relationship. For this purpose the State introduced the affidavit of the prosecutor, in which he deposed that he made investigations as to the existence of the alleged relationship between himself and these jurors, that he found, from reputation and from knowledge of people who knew the facts, that there is no relationship between him and said jurors, that he found sufficient facts to enable him to know that these jurors were not descendants of Polly Wilcher, as alleged by the defendant, and that therefore they are not related to deponent in that way. The defendant objected to this affidavit, because it showed that it was only hearsay, the deponent not stating from whom or from what source his information came, and not naming the people who communicated the fact to him that there was no relationship between him and these jurors, and because deponent did not state that any communication which he undertook to testify about came to him from any member of the McNeal family or the Wilcher family. The court overruled this objection and admitted this affidavit.

The State in rebuttal introduced also the affidavit of the juror Levi Kitchens, who deposed that he had made a full investigation of the relationship alleged to exist between him and prosecutor,

that from reputation in his family, from his own knowledge, and from all other reliable sources he could find nothing which indicated any relationship between him and the prosecutor, and upon such information he deposed that there is no such relationship. To this affidavit the defendant objected upon the ground that it did not set out to what extent the investigation of affiant went as to the alleged relationship, that affiant did not state from whom or how he was informed that no relationship existed between him and prosecutor, and did not state from whom he received the other reliable information referred to in his affidavit, and did not state that the information or conclusion that he reached from his investigation was received from any member of the McNeal family or the Wilcher family.

The State introduced also the affidavit of G. W. Kelly, who deposed that he had known the Wilchers and McNeals, and that he knew by reputation that Jim McNeal's wife, Polly, was not the daughter of Billie Wilcher, and that he had never heard of any relationship between the prosecutor and said jurors. The defendant objected to this affidavit, upon the ground that the affiant did not state that the reputation to which he referred was the reputation existing in the McNeal family or the Wilcher family.

The State introduced also the affidavit of I. S. Peebles, who deposed that he was 82 years of age, that he knew the daughters of Billie Wilcher, that the latter had three daughters, one of whom was Betsy, and she married a man named Lyon, another was Fannie, and she married a man named Coxwell, and the other daughter married Buck Dixon; that he knew by reputation in the family that Jim McNeal's wife was an illegitimate child and was not the daughter of Billie Wilcher's wife; that he did not know who her father was; that it was reputed that another man was her father, but affiant knew that she was not the daughter of Billie Wilcher's wife, and there was no relationship through her between said jurors and the prosecutor that he knew of. To this affidavit the defendant objected upon the ground that the affiant did not swear that he was one or any member of the McNeal or Wilcher families, and did not swear that the reputation he testified about came from either the McNeal or Wilcher families.

The State introduced also the affidavit of W. T. Downs, who deposed that he was familiar with the family history of the Wilcher

and McNeal families, that he knew by reputation that Jim McNeal's wife, Polly, was not the daughter of Billie Wilcher, and that on account of this fact there could be no relationship between the prosecutor and said jurors. To this affidavit the defendant objected upon the ground that affiant nowhere stated in his affidavit from what source he gained his familiarity with the history of the McNeal and Wilcher families, or from what source he gained any knowledge of the reputation that he claimed to have.

The State introduced also the joint affidavit of M. L. Logue and the prosecutor, who deposed that in a conversation a few days previously, with Polly Ann Dixon, who was 90 years of age, she told them that when she was a girl she frequently heard and knew it to be the reputation in the community that Polly McNeal was the illegitimate daughter of a woman named Calhoun, and that to her knowledge one Granberry was the reputed father of Polly, who was sometimes known as Polly Wilcher, that said Polly simply appropriated the name of Wilcher, and that she was not the daughter of Billie Wilcher. To this affidavit the defendant objected upon the ground that it only undertook to prove the sayings of Polly Ann Dixon, that the facts stated in the affidavit were not relevant unless proved by the affidavit of Polly Ann Dixon herself, that it was hearsay, and that it stated the sayings of Polly Ann Dixon as to the reputation in the community, and did not state that such information came from either the McNeal or the Wilcher family.

The judge overruled the objections of the defendant to these affidavits, and the defendant excepted and assigned error. This brings us to consider what is the proper method of proving relationship between the prosecutor and the challenged jurors. This can be established by persons having personal knowledge upon the subject. The witnesses must appear to have had fair knowledge, or fair opportunity for acquiring knowledge upon the subject. It is not required that the witnesses were present at the birth, marriage, or death, to be competent to testify as to relationship. The theory is that the constant, though casual, mention and discussion of important family affairs, whether of the present or past generation, puts it in the power of members of the family circle to become fully acquainted with the original knowledge and the consequent tradition upon the subject. Witnesses having such knowledge can testify to relationship as coming within their own knowledge. 3

Wigmore on Evidence, 222, § 1486. So a witness may testify to his own age, notwithstanding all his information upon the subject is derived from his mother, who is living in the county where the trial occurs. *McCollum* v. *State,* 119 *Ga.* 308 (46 S. E. 413, 100 Am. St. R. 171) ; *Central R. Co.* v. *Coggin,* 73 *Ga.* 689. Again, relationship may be established by the declarations of deceased persons related by blood or marriage, or by general repute in the family, or by genealogies, inscriptions, family trees, and similar evidence. Civil Code (1910), § 5764. Sayings of a deceased person can not be rendered competent evidence on a question of pedigree, by proving that such person said he was a kinsman or relative of the person whose pedigree is the subject matter of the inquiry. The fact of relationship must be shown by other evidence. *Green* v. *Almand,* 111 *Ga.* 735 (36 S. E. 957). There must be some extrinsic evidence that the declarant was related to the family. *Terry* v. *Brown,* 142 *Ga.* 224 (82 S. E. 566).

Applying the above principles, the trial judge erred in admitting the affidavit of J. H. Wilcher. He does not depose that he knows the facts stated in his affidavit from his own knowledge. He does not state that he learned the facts stated in his affidavit by declarations of deceased persons related by blood or marriage to himself or the jurors, or from general repute in the families of either himself or the jurors. Furthermore, he does not state what facts he found upon his investigation; and the allegations of his affidavit seem to set forth mere conclusions. We are of the opinion that the trial judge erred in admitting the above affidavit of Levi Kitchens. This affidavit does not purport to be based upon the personal knowledge of the affiant. It does not undertake to set out any declarations of persons since deceased, related either to him or to the prosecutor in this case. Affiant does not state what was the repute in his family upon this subject. He merely states that from reputation in his family, from his own knowledge, and from all other reliable sources he can find nothing which indicates any relationship between him and the prosecutor. Based upon such information, he says that there is no such relationship. In order to bring himself within the rule admitting such testimony he ought to state what facts he learned from repute in his family, or the family of the prosecutor, touching this relationship. He could not base his conclusion upon what he found in part from reputa-

tion in his family, in part from his own knowledge, and in part from other reliable sources. He certainly ought to have stated the facts which he found from such source, and not merely stated the conclusion he draws from all the above sources. Clearly the affidavit of G. W. Kelly is not admissible. He does not depose that the conclusion drawn by him was based upon repute in the family of Jim McNeal. The affidavit does not set up any declarations of deceased persons related either to the jurors or the prosecutor upon this subject. The joint affidavit of W. L. Logue and the prosecutor was not admissible. Reputation in the community that Polly McNeal was the illegitimate daughter of a woman named Calhoun would have been irrelevant and inadmissible if offered for the purpose of establishing such illegitimacy. Being irrelevant, the statement of Polly Ann Dixon that she had heard and knew it to be the reputation in the community that Polly McNeal was such illigitimate was likewise irrelevant and inadmissible. The illegitimacy of Polly McNeal could not be established by reputation in the community. Besides, proof of this statement was pure hearsay, and for that reason was inadmissible. The objections to the affidavit of W. T. Downs were well taken. Affiant states that he is familiar with the family history of the Wilcher and McNeal families. He does not state that he acquired this information from declarations of persons since deceased, related to either of these families. He states that he knows by reputation that Jim McNeal's wife was not the daughter of Billie Wilcher, but he fails to state that this reputation existed in either of these families, or both. For these reasons we think that this affidavit was inadmissible, and it was error for the trial judge to overrule the objections thereto.

We come next to consider the affidavit of W. S. Peebles. The objections of defendant were urged to the entire affidavit, and not to portions thereof. Some parts of this affidavit were admissible. Affiant swears to some of the facts therein set out as coming within his own knowledge. He further deposes that the reputation in the family was that Jim McNeal's wife was an illegitimate child, and that she was not the daughter of Billie Wilcher's wife. The objection is that he does not name the family from which this reputation came. Fairly construed, we think that it refers to the Wilcher family; and in this view this part of his affidavit was ad-

missible. If other parts of his affidavit were inadmissible for any reason, objection should be made to such portions and not the affidavit as a whole. For this reason the objections to the affidavit as a whole were not well taken. Having reached the conclusion that the above affidavits introduced by the State in rebuttal of this ground of the defendant's motion for new trial, with the exception of that of Peebles, were improperly admitted, does this fact require the grant of a new trial in this case? We are of the opinion that it does not, as we are of the opinion that the evidence authorized the verdict of guilty, and that there was no error committed which requires the grant of a new trial, unless it is found by the trial judge that these jurors, whose competency to try the case was challenged, were disqualified by reason of kinship to the prosecutor. The trial judge found that they were not so related; but he based his finding on some evidence which we have held to be inadmissible. This error does not require the grant of another trial to the defendant upon the merits, unless it is determined by the trial judge from relevant evidence that these jurors were related within the prohibited degree to the prosecutor. In that event a new trial should be granted. We are of the opinion that the proper proceeding is not to reverse the judgment for refusal to grant a new trial, but to reverse the judgment overruling the motion for new trial, and to remand the case with direction that the judge pass upon the disqualification of these jurors to try this case, after excluding the evidence which we hold was improperly admitted, and decide whether these jurors were disqualified to try the same. In passing again upon this question, we direct that the judge receive such further and other evidence which may be relevant in passing upon this issue, offered either by the defendant or the State; and that, if the judge reaches the conclusion that these jurors were disqualified, he then grant a new trial; but on the contrary, if he finds that these jurors were qualified to try the case, that he then overrule the motion for new trial.

*Judgment reversed, with direction. All the Justices concur.*

ON MOTION FOR REHEARING.

■ In the first ground of his motion for rehearing the defendant insists that the direction which we gave for the further hearing of certain grounds of his motion for new trial, which attack the competency of certain jurors to try him, puts him in jeopardy of

his life and liberty more than once for the same offense. This position is not sound. A person is in legal jeopardy when he is put upon trial, before a court of competent jurisdiction, upon indictment and information which is sufficient in form and substance to sustain a conviction, and a jury has been charged with his deliverance. Cooley's Const. Lim. (4th ed.) 404; Bouvier's Law Dict. (Students' Ed. 1928), passim Jeopardy. Remanding his motion for new trial for a further hearing and determination by the trial judge in no way puts him in jeopardy in the sense in which that word is used. If his motion for new trial is overruled, he suffers the consequences of his former jeopardy. If his motion for new trial is granted, he will be put in jeopardy again; but this will occur "on his own motion for a new trial," and will not fall within the provision of the constitution of this State which prohibits the putting of a defendant in jeopardy of life or liberty more than once for the same offense.

■ In the second ground of his motion for rehearing the defendant asserts that this court overlooked the fact that he did not in the court below make a motion to change the venue of his case, as suggested in the opinion of this court, but that this ground of his motion was a mere declaration addressed to the trial judge by him to the effect that as the jury-box had been exhausted in an effort to get a qualified jury to try the case, and as the judge had announced from the bench that it was impossible to get a jury in the county to try his case, the jurisdiction of the superior court of Glascock County was lost, and his motion to declare the venue in some other county as prescribed by law was not a motion to change the venue because he was in danger of being lynched or because he could not get a fair and impartial trial in the county. The defendant asserts that his motion was based upon the announcement of the court that he had exhausted the jury-box of the county, but could not get a qualified jury, by reason of which the superior court of Glascock County lost its jurisdiction of the case, and there is no authority of law to reinvest jurisdiction in that court. At the November term, 1929, of Glascock superior court, the defendant filed his motion in which he made these allegations: By the judgment of the court in this case at the present term thereof it appears that the court had exhausted the entire list of all names contained in the traverse and grand jury-boxes of the county, that it was im-

possible to obtain a qualified jury to try his case, and that only ten qualified jurors were obtained; in consequence of which a mistrial was declared. The defendant contended before the court that by such judgment of the court the jurisdiction of Glascock superior court was divested and lost, and that any motion thereafter made by him was in no way to be construed as a waiver of this contention. Therefore, reserving all his rights to the above contention, he moved that the court declare the jurisdiction of the superior court of Glascock County divested and lost, and to declare the jurisdiction of his case invested in the superior court of such county in Toombs Judicial Circuit, or any other county in the State, as may be agreed upon by the parties and counsel in the case; and that in the event of a disagreement between them as to the county which should have jurisdiction of the case, then movant petitioned the court to transfer the jurisdiction of his case to such county as in the judgment of the judge might meet the ends of justice, and to "declare the venue for the trial of said case changed to such county as may be thus designated." Movant further alleged that he had been confined in the common jail of the county since December, 1927, on the charge of murder; that he was tried at the February term, 1928, of said court, retried by another jury in said county at the November term, 1928; and that the grand jury-box of said county contained 104 names and the traverse jury-box contained 263 names, which included the 104 grand jurors, and he therefore was entitled to a reasonably speedy trial and hearing of said case.

It will be noted that the defendant in this motion petitioned the court to transfer the jurisdiction of his case to another county, and to "declare the venue for the trial of said case changed to such county as may be thus designated." Thus the defendant expressly prayed for a change of venue. On the same day the judge overruled this motion. In December, 1929, the defendant filed his exception pendente lite. This exception recites that the defendant made a motion "that the court pass an order declaring and adjudging the superior court of Glascock County to be divested of the jurisdiction of said case, and also to change the venue of said case to the superior court of such county . . as might be selected in the manner provided by the statute in such cases for changing the venue in such cases." Here the defendant again expressly declared that his motion was for a change of venue. In view of

these facts, we do not think that this court erroneously designated his motion as one for a change of venue; and we are of the opinion that we properly so treated the motion in our opinion in this case.

■ In the third ground of his motion the defendant asserts that this court in rendering its judgment overlooked section 6090 of the Code of this State, which declares that "Where an order is taken to hear a motion for new trial in vacation, the brief of the evidence must be presented for approval within the time fixed by the order, or else the motion will be dismissed." This section refers to evidence introduced upon the trial of the merits of a case. It does not refer to such evidence as the parties may desire to introduce to sustain or rebut grounds of a motion for new trial which attack the competency of jurors to try the case; certainly not to evidence introduced by the State for the purpose of rebutting such grounds of his motion for new trial.

■ In the fourth ground the defendant contends that the judgment of this court places the State's burden upon him; and requires him, contrary to the rule of law in such cases, to establish his contention that the jurors attacked were related to the prosecutor. This contention is based upon the proposition that the affidavits introduced by the defendant disclose the incompetency of these jurors to try this case, that this court held that certain parts of the affidavits used by the State in its counter-showing should have been excluded, and that, with these parts of these affidavits ruled out, there is left only the affidavits of the defendant, which show conclusively and undisputedly that these jurors were related within the ninth degree to the prosecutor. The defendant contends that the only legal judgment which could have been rendered was to declare a new trial unconditionally, and not allow the State to come back and undertake to meet the showing made by the defendant that two of said jurors were related within the prohibited degree. Defendant contends that this would be an injustice to him, and that, if such a rule can be lawfully established, it would not be impossible for the introduction of such evidence to occur a third time, and give the State a third trial to see if it could make a counter-showing, and thus defeat a new trial. We can not agree that the evidence introduced by the defendant as to the incompetency of these jurors is undisputed. With the parts of the affidavits introduced by the State ruled out as required by the judg-

ment of this court, there was still some evidence to rebut the affidavits introduced by the defendant upon this subject. In this state of the record we thought it was but just to the defendant to permit a rehearing by the trial judge upon these grounds of the motion for new trial. We did this under the statute which provides that "it shall be within the power of the Supreme Court to award such order and direction to the cause in the court below as may be consistent with the law and justice of the case." Civil Code (1910), § 6205. The conviction of the defendant should not stand if he was tried by incompetent jurors. On the other hand, a new trial should not be granted if he was convicted by competent jurors. To ascertain the truth on this subject, we directed a rehearing on these grounds of the motion for new trial, with the right to the State and the defendant to introduce on that hearing any competent evidence tending to showing the incompetency or competency of the jurors attacked.

We therefore overrule the motion for a rehearing.