22664. LYDA *v.* THE STATE.

DECIDED MAY 27, 1933.

*Mozley & Gann, Blair & Gardner, Sam Kimzey,* for plaintiff in error.

*George D. Anderson, solicitor-general,* contra.

MACINTYRE, J. The indictment in this case charges G. C. Lyda "with the offense of misdemeanor," for that the said accused, on September 20, 1930, in Cobb county, Georgia, "without having made application to the Georgia State Board of Medical Examiners through the Secretary-Treasurer of said board for license to practice medicine, and without having obtained a license from said Georgia State Board of Medical Examiners to practice medicine, did then and there practice medicine upon and for one Isaac Darby, receiving and intending to receive compensation therefor." The jury trying the case found the defendant guilty, and his exception here is to the judgment overruling his motion for a new trial.

Isaac Darby testified, in part, as follows: "I know the defendant . . G. C. Lyda. I don't recall at what time I went to see him, but it was about a couple of years ago. . . I can't say what business or profession Doctor Lyda is engaged in—only just selling medicine is all I know. I went to him at his place down there, . . the Crawford Reid old home, just off the Atlanta road, in Cobb county. . . I believe I was down there twice. . . I imagine it was about an eight-room house, or a little larger. . . I guess there were as many as twenty-five there. I don't know what they were there for. As to what arrangements I had to make before I got to see Dr. Lyda, well, some one there in the hall just gave me a ticket with a number on it. . . I didn't go in when my number was called, but I slipped in with some others there with a number. I didn't wait until my number came up. When I went in I saw the doctor. . . With regard to what examination he made of me, my recollection is that he just looked at my eye, pulled one lid down and looked in it. . . As to what he said was the matter with me when he looked in my eye, my recollection is that he said something about having stomach trouble. Then he

just turned around and told his sister what kind of medicine to fix up, and they wrapped it up. I paid $2.50 for that. . . He just pulled the lid of my eye down this way, but he did not then order his sister to prepare a certain kind of medicine for me. I told him when I went in and sat down how I felt, and all, and told him what I ate didn't agree with me, and that I had the indigestion for fourteen years."

On cross-examination the witness Darby testified in part as follows: "They [two packages of medicine] were already fixed up. I simply paid him for these two packages. I didn't pay him for any examination; I didn't understand it that way when I went down there. I did not promise to pay him for any services, except just for the medicine that I bought. I have never paid him for anything except for those two packages of medicine. . ."

On re-direct examination Darby testified in part: "Some of these people that went in ahead of me, or with me, reached the doctor ahead of me. What he did to them was, he just talked to them there in the room. That is all I saw him do. As to what he did in reference to prescribing for them, I never heard him say anything about it, only he told his clerk there to wrap a certain kind of medicine. Each one of the patients spoke to the doctor first, rather than to his clerk. Each one of them that I saw consulted the doctor first, and then, after the consulation, he would tell his assistant to wrap up a certain kind of medicine."

On re-cross-examination, Darby testified in part as follows: "I did not ask the clerk for any specific kind of medicine or have anything in mind that I wanted. After the conversation with me, and doing what I described to the jury, . . he . . said something to her [his assistant], and she wrapped up a bottle and a box of powders, and I asked how much she charged, and she said $2.50, and I paid the money there at that time. . . I went back another trip and he [the defendant] was gone, and I went in there and bought the same kind of medicine. At the time I went there I told him what I wanted, and I wanted medicine for my stomach. . . I knew at that time that he had certain patent medicines,— or had been informed that, and I went there to buy those specific medicines for my stomach, and I didn't go there for any purpose of getting him to prescribe for me at all. Some of them told me he sold everybody the same kind of medicine—he didn't have but one

48

kind." On further direct examination, Darby swore: "As to why it was, if I knew what I was going to get, that I went to the doctor for it, and why I didn't go to his assistant,—I didn't know he had an assistant until I went there."

Mrs. Leon Gilbert testified, in substance, that her sister, whose trouble had been diagnosed as cancer, stayed nearly two weeks at Doctor Lyda's place; that witness's sister knew what she wanted and asked for cancer medicine, and the doctor did not prescribe for her; that witness did not accompany her sister when she first went to see Dr. Lyda; that witness did not "remember how much was paid the doctor;" and that witness would not undertake to state how many times the doctor saw her sister.

Dr. L. L. Welsh testified that Mrs. Helen Wellands delivered to him a card, a copy of which was as follows:

"Dr. G. C. Lyda, Specialist on Cancer.

"Mt. Airy, Ga.   Marietta, Ga.   Rome, Ga."

Mrs. Helen B. Wellands testified, in part, as follows: "In the last six or eight months I have been engaged most of the daytime at Ralph W. Northcutt's Buick place. Doctor Lyda has been in that place within the last six months. He came there to buy gasoline and have work done on his car. I remember the time that Mr. Ralph Northcutt was sick. . . Dr. Lyda on a number of times asked about Mr. Northcutt's health; he said that he thought he could help him, and that it wouldn't cost him one five cents." The witness further swore that, at her request, Dr. Lyda gave her a card similar to the one delivered by her to Dr. Welsh.

Biney Davis testified in part as follows: "I knew Mr. Ernest Burton in his lifetime. I went with Mr. Burton to see Dr. Lyda to find out what was the matter with him. . . I reckon the doctor told him what was the matter with him. I was with him. As to whether or not he examined him,—he put his hand on the back of his neck here. I never saw Mr. Burton pay him anything. . . The agreement was, if he cured him he would pay him $100, and if he didn't cure him he wouldn't charge him anything. . . He didn't treat him that day. When Mr. Burton was taken away from his home he went down there [to the defendant's place]. I couldn't tell you how long he stayed down there, not positively, but . . maybe two weeks. . . Dr. Lyda told Mr. Burton when he examined him that he had cancer, and he told him he thought he could

cure him. He told him that in my presence up in Habersham county at his home. . . I saw the doctor there [at the defendant's place], but I never saw him about Mr. Burton though. . . Mr. Burton is now in the cemetery. . ."

R. C. Coleman, secretary of the State Examining Board, testified that he kept the records of the board and had examined them, and that there was "no record there of G. C. Lyda ever having been issued a license to practice medicine in Georgia."

Luther Huie testified: that he carried his wife to Dr. Lyda's place and the doctor examined her; that Lyda "didn't prescribe any medicine for her, . . didn't give her any medicine," but said she had cancer and put two plasters on her.

George Hirshton testified: that he "went to him [Dr. Lyda] for treatment" some time in 1930; that on his first visit Lyda's sister gave him a treatment, and told him that if he was not satisfied, to come back and she would return his money; that two weeks later he went back to the defendant's place "and talked with him, and got some of the identical medicine" he got the first time; that on his second visit, Lyda gave him the medicine and told him to take it; that "he charged me $2.50 for each treatment for two weeks;" that "there was quite a lot of people in and out" when witness was there; and that witness never saw any one else being treated, "because they were always in a separate room to the one I was in."

Bob Jenkins testified, in part, as follows: "I know Dr. G. C. Lyda. . . I had some dealings with him as a physician or healer. He was down in our settlement, and Mr. McQueen . . told him about my wife having high blood pressure, and the doctor said he would come up there and see her, and he did. . . He gave her some medicine and said he would guarantee to cure her for $10, and then quit giving any more medicine. He made the trip about two or three times. . . As to whether or not I mean he was traveling down in my county hunting up patients,—well, he was down in there. I didn't send for him. He claimed the trouble with my wife was high blood pressure. He made an examination of her to see what was the matter with her. He had an instrument there that he tested her blood pressure with, and he said what it registered. . . He prescribed for her immediately after he made the test. He had his medicine with him,—a part of it he did, and the next time he brought some more.. I paid him on his second visit,

and then he quit coming. That has been about a year ago. He told me he was a practicing physician in the Indian Territory for eighteen years." Under cross-examination, the witness failed to locate the man who treated his wife—said he did not know his name, but just knew him as "the Indian doctor."

Julian Dobbins testified: that he was an undertaker, but that he had never been called to Dr. Lyda's place; that he had taken some patients there—Mr. Medley and Mrs. Bullard; that Dr. Lyda examined Mr. Medley and prescribed for him and "gave him some stuff to take away," but that he did not see Medley pay him anything for it; and that this was "about a year ago."

The State introduced in evidence a certified copy of an indictment procured at the March term, 1928, of the superior court of Habersham county. This indictment contained two counts, the first charging the defendant with practicing medicine on March 1, 1928, without registering; and the second charging him with practicing medicine on January 1, 1928, without paying the special tax, and without obtaining a license. On the back of this indictment was a plea of guilty, dated March 9, 1929.

The indictment in this case is based upon section 15 of the act of the General Assembly of 1913, amended by act of 1918 (Ga. L. 1913, p. 108; Ga. L. 1918, p. 196; Michie's Code (1926), § 1697 (14); Park's Code Supp. 1922, vol. 8, § 1697 (n)). The material part of said section is as follows: "The terms 'practice of medicine,' 'to practice medicine,' 'practicing medicine,' and 'practice medicine,' as used in this act, are hereby defined to mean holding one's self out to the public as being engaged within this State in the diagnosis or treatment of disease, defects or injuries of human beings, or the suggestion, recommendation or prescribing of any form of treatment for the intended palliation, relief or cure of any physical, mental or functional ailment or defect of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift or compensation whatsoever, or the maintenance of an office for the reception, examination or treatment of any person suffering from disease, defect or injury of body or mind, or attaching the title M. D., Oph., D., Dop., Surgeon, Doctor, either alone or in connection with other words, or any other words or abbreviations to his name indicative that such person is engaged in the treatment or diagnosis of disease, defects or injuries of human

beings. If any person shall hold himself out to the public as being engaged within this State in the diagnosis or treatment of disease or injuries of human beings, or shall suggest, recommend or prescribe any form of treatment for the palliation, relief or cure of any physical or mental ailment of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift or compensation whatsoever, or shall maintain an office for the reception, examination or treatment of diseased or injured human beings, or shall attach the title M. D., Oph., D., Dop., Surgeon, Doctor, either alone or in connection with other words, or any other word or abbreviation to his name indicative that he is engaged within this State in the treatment of diseased, defective or injured human beings, and shall not in any of these cases then possess in full force and virtue a valid license to practice medicine under the laws of this State, he shall be deemed to be practicing medicine without complying with the provisions of this act, and in violation thereof. . ." We have set out the material evidence in this case at considerable length, and see no reason for repeating it. We hold that the evidence supports the verdict and that the trial judge did not err in overruling the general grounds of the motion for a new trial.

Special ground 1 complains of the admission of the testimony of Mrs. Leon Gilbert (hereinbefore set out) in regard to a transaction wherein, at a time not stated in the ground, the witness's sister remained at the defendant's place for nearly two weeks and took his cancer medicine. It appears from the court's note to the ground that, in passing upon the admissibility of the evidence, the court said: "I will let it in to shed light and illustrate, if it does illustrate, this issue that is being tried at the present time. But I charge you . . that the defendant could not be convicted of the offense charged in the present indictment because he might have committed some other similar offense at some other time and occasion. But I let it go to you to illustrate, if it does illustrate, this issue as to the state of the mind of the defendant, his intent, things of that kind. You will determine whether it illustrates it or not." It further appears from the court's note that he made the foregoing statement applicable to the numerous other instances where like evidence was objected to for a like reason. Specifically referring to such instances, the court said: "I understand that similar offenses covering the similar and general period of time, the same

territory, are admissible for the purpose of showing a general scheme or purpose or intent on the part of a person—to show his state of mind, as I understand it. I permit it to go to the jury to illustrate the issue that is being tried. But as I stated, under no circumstances could you convict the defendant of this offense because you might find that he has been guilty of some other offense." The objection to said testimony was: "that the testimony offered was in no way connected with the indictment read in this case; that the defendant was indicted for prescribing for one Mr. Darby, and that any other evidence about somebody else and on some other occasion —prescribing for or taking care of some other person, would not be admissible in this case." Was the testimony subject to the objection stated? Or, in order to make the query more general, in view of the fact that there are several similar exceptions, where a defendant is on trial for practicing medicine without a license upon a named person, is evidence tending to show that he practiced medicine (without a license) upon persons other than the one named in the indictment admissible? In Singh v. State, 66 Tex. Crim. 156 (5), 164 (146 S. W. 891), Judge Harper, speaking for the court, said: "The only other serious contention is that the State having charged that appellant did treat and offer to treat Mrs. M. Kate Ball, that evidence that he had treated and offered to treat other people should not have been admitted. The law does not denounce the treatment of each individual as a separate and distinct offense, but the offense defined is for a person to treat or offer to treat any disease or disorder without having been licensed so to do by the State Board, and, while under the information it would be necessary to prove that he did treat the person named and receive payment therefor, yet the State would not be limited to this proof alone under the information in this case, but could introduce other evidence which showed and tended to show that the appellant was treating and offering to treat various diseases for compensation. Especially would this be true under the evidence in this case, as appellant by his evidence was contending that he did not charge for such treatment either directly or indirectly, but only accepted free-will offerings." "On trial· of illegally practicing medicine there was no error in admitting in evidence the fact that defendant had treated others than the person alleged in the indictment." Germany v. State, 62 Tex. Crim. 276 (2) (137 S. W. 130, Ann.

Cas. 1913C, 477). In Chambers v. State, 26 Ala. 59 (2), it was held that "Under an indictment against a negro trader for exhibiting slaves for sale without a license (Pamph. Acts 1849-50, p. 8), after evidence had been offered of a particular act of sale within the time covered by the indictment, evidence of a previous act more than twelve months before the finding of the indictment is admissible for the State, as tending to show that the defendant was engaged in the business of negro-trading." "Where one is on trial charged with the commission of a crime, proof of a distinct and independent offense is never admissible, unless there is some logical connection between the two, from which it can be said that proof of the one tends to establish the other." *Wilson* v. *State*, 173 *Ga.* 275, 284 (160 S. E. 319). In *Cole* v. *State*, 120 *Ga.* 485 (48 S. E. 156), a witness was allowed to testify that "upon searching the house of the accused on a day subsequent to that on which the accusation charged that the sale was made, bottles of whisky were found, the objection being that this evidence could in no way illustrate the issue whether the accused had sold whisky on the day alleged." The Supreme Court held in that case that "This evidence was clearly admissible as a circumstance from which the jury might infer that the accused kept whisky in his house for sale, and therefore to strengthen the testimony given as to the sale charged in the accusation." In *Jones* v. *State*, 32 *Ga. App.* 7 (122 S. E. 738), this court held: "In a prosecution for possessing whisky it is not error to admit evidence that on other occasions, both before and after the date of the offense charged in the accusation, whisky was found in the place of business of the accused." The first citation to sustain this ruling is the *Cole* case, supra. See also *Cook* v. *State*, 33 *Ga. App.* 571 (127 S. E. 156). In *Ealey* v. *State*, 40 *Ga. App.* 727 (151 S. E. 400), the defendant was convicted of possessing whisky on March 27, 1929. It was there held that the trial judge did not err in admitting in evidence two accusations, the first charging the defendant with possessing whisky on July 12, 1927, and having thereon a plea of guilty entered September 28, 1927, and the second charging the defendant with possessing whisky on November 15, 1926, and having thereon a plea of guilty entered April 6, 1927.

In the case at bar the defendant is charged with practicing medicine upon a particular person at a stated time, and of course this

charge would have to be proved. But it is not customary for a doctor to limit his practice to one patient; and would it not strengthen the testimony given as to the particular transaction charged to prove that the accused practiced upon others at times not remote from the time he is alleged to have practiced upon the accused? In short, in a case like this, where the main defense is that even though the defendant sold medicine, he never practiced that profession, is it not competent for the State to prove, if it can, that the defendant did practice that profession generally? It occurs to us that this is peculiarly a case where proof of other offenses tending to show that the defendant practiced medicine generally was admissible as tending to establish the offense charged. It will be observed that the definition of "practicing medicine" (hereinbefore set out) is very comprehensive,—more so, indeed, than is the ordinary definition of that phrase. Was it not competent to show that the defendant held himself out to the public as being engaged in the diagnosis or treatment of diseases, or that he suggested, recommended, or prescribed medical treatment, with the intention of receiving a fee therefor, or that he considered himself a doctor of medicine? We think so, and, without more, hold that there is no merit in the ground under consideration.

The remaining grounds are so similar to the one we have just considered that they are substantially controlled by our ruling upon the first special ground, and we see no reason for considering them separately. In some instances, where the evidence tended to prove that the defendant practiced medicine upon others than the person mentioned in the indictment, no time is stated at all, and none appears in the ground. In others the ground discloses that the incident occurred within something like a year of the time when the indictment in the present case was returned, but in no instance does the objection appear to be based upon the fact that the occurrence was too remote in time to illustrate the issue in the present case. It is true that one ground avers that the court erred in allowing in evidence the indictment hereinbefore described, with the plea of guilty thereon to practicing medicine illegally in another county at a time antedating the offense with which the defendant is charged in the present indictment by a little more than two years. We think, however, that said indictment and plea of guilty were admissible to

show that the defendant was practicing medicine in this State, and thus to throw light upon the question directly at issue in the case at bar. In this connection, see *Ealey* v. *State,* supra. In United States *v.* Stickle, 15 Fed. Rep. 798 (4), where the defendant was charged with "a fraudulent use of the postoffice of United States," it was held that "The fact that the accused on a former occasion was accused of a similar offense, pleaded guilty to the charge, and was convicted thereof, although such conviction would be a bar to any subsequent prosecution for that offense, may be considered by the jury as a confession on his part at that time, tending, with other circumstances in his conduct, to show the character of the business he had at that time been establishing and carrying on, and has since carried on; and in this connection the jury should also consider his explanation of his reasons for pleading guilty." We hold that the ground complaining of the admission of the former indictment, with the plea of guilty thereon, is not meritorious. We further hold, without discussing the grounds of the motion for a new trial seriatim, that no special ground of the motion discloses reversible error.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*