## ESTILL, guardian, *et al. v.* ESTILL *et al.*

PER CURIAM. 1. Where, upon a material issue in a case, the evidence in behalf of one party is positive and the evidence in behalf of the opposite party is negative, it is error to instruct the jury: "The existence of a fact testified to by one positive witness is to be believed rather than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they did not see or know of its having transpired. This rule does not apply when, two parties having equal facilities for seeing or hearing a thing, one swears that it occurred, the other that it did not," without the qualification that the witnesses in other respects are found to be equally credible. *Humphries* v. *State,* 100 *Ga.* 260 (28 S. E. 25); *Atlanta Consolidated Street Ry. Co.* v. *Bigham,* 105 *Ga.* 498 (30 S. E. 934); *Southern Ry. Co.* v. *O'Bryan,* 115 *Ga.* 659 (42 S. E. 42); *Atlantic Coast Line R. Co.* v. *O'Neill,* 127 *Ga.* 685 (56 S. E. 986); *Central of Georgia Ry. Co.* v. *Orr,* 128 *Ga.* 76 (57 S. E. 89); *Alabama Great Southern R. Co.* v. *Brock,* 139 *Ga.* 248 (77 S. E. 20); *Ware* v. *House,* 141 *Ga.* 410 (81 S. E. 118); *Georgia Railroad &c. Co.* v. *Radford,* 144 *Ga.* 22 (85 S. E. 1006). Consequently the trial judge did not err in granting a new trial on the ground assigning error upon the instruction just quoted.

2. Where the paternity of a child is the issue involved, the declarations of the reputed father, since deceased, are admissible in evidence, under section 5764 of the Civil Code, which provides: "Pedigree, including descent, relationship, birth, marriage, and death, may be proved either by the declarations of deceased persons related by blood or marriage, or by general repute in the family, or by genealogies, inscriptions, 'family trees,' and similar evidence." The weight to be given the declarations is a matter for the jury.

(*a*) The case of *Mobley* v. *Pierce,* 144 *Ga.* 327 (87 S. E. 24), differs on its facts from the present case, and does not require a contrary holding.

*Judgment on both bills of exceptions affirmed. All the Justices concur, except Atkinson, J., disqualified, and Hill, J., dissenting from the ruling in the second headnote.*

Nos. 1126, 1169. SEPTEMBER 27, 1919.

Interpleader. Before Judge Meldrim. Chatham superior court. July 19, 1918.

John Holbrook Estill died on November 9, 1907, leaving a will the eighth item of which was as follows: "And to the Citizens and Southern Bank of Savannah one sixth part, which it shall hold as trustee upon the following uses and trusts, namely, to pay the income therefrom to my son, Marion W. Estill, during the term of his natural life, for the support of himself and the support and education of his children should he leave any, and after his death said income to be applied to the support and education of his children, the principal to be equally divided between them when

the youngest child attains the age of twenty-one years. In the event of the death of either of said children during minority and without leaving issue, the share of the one so dying shall go to the survivor or survivors, children of a deceased child to represent the parent. If, however, my son, Marion W. Estill, should depart this life leaving no child or issue of a child him surviving, then the one sixth part shall be equally distributed between the distributees of the other five sixths in the manner provided in this item." Marion W. Estill, the son named in the foregoing item of the will, died on December 26, 1915. Marion W. Estill married Elizabeth Pate on October 30, 1902. After the death of Marion W., Mrs. Elizabeth Pate Estill, as guardian of Marian Virginia Estill, alleged to be the child of Marion W. Estill and Elizabeth Pate Estill, called upon the Citizens and Southern Bank to pay to her the income which she claimed was rightfully due to her as guardian and as next friend of Marian Virginia Estill, under the eighth item of the will of John Holbrook Estill. The bank refused to pay over the income to the guardian, and the guardian filed suit against it in Chatham superior court. The bank filed a petition for interpleader, in which it alleged that it had been notified by the other legatees and claimants under the will of John Holbrook Estill that Marion W. Estill died without children or issue or child surviving him; that Marian Virginia Estill was not his child, and that she was not entitled to receive the income under the will. The parties at interest were required to interplead. Marian Virginia Estill, by her mother, Elizabeth Estill as guardian and as next friend, filed an answer setting up the claim of the minor to the trust fund, and praying that the trustee be directed to pay the income of the trust property to the guardian. The heirs of John Holbrook Estill, entitled under his will to the property in the event Marion W. Estill died without child or the issue of child surviving him, in their answer alleged that Marian Virginia Estill was not the child of Marion W. Estill, but that the said Marian Virginia Estill was taken as an infant by Marion W. Estill and his wife, Mrs. Elizabeth Pate Estill, and claimed as their child for the purpose of securing to Elizabeth Pate Estill control of the income from the property in question and for the purpose of depriving the defendants of the same. The cause came on for trial at the November term, 1916, of Chatham superior court. The jury

returned a verdict in favor of the guardian, and the defendants filed a motion for new trial, which was granted by the court. To this grant of a new trial the guardian filed exceptions, and the judgment of the court was affirmed by the Supreme Court at the October term, 1917. *Estill* v. *Estill,* 147 *Ga.* 358 (94 S. E. 304). In April, 1918, the case was again submitted to a jury in Chatham superior court. The plaintiffs relied upon positive evidence, while some of the evidence for the defendants was negative in character.

The court, over objection of defendants, admitted in evidence the declarations of Marion W. Estill, made after September 9, 1912, tending to show that Marian Virginia Estill was his child. The ground of objection was that the declarations were made post litem motam. For the most part these declarations were contained in letters written by Marion W. Estill, while absent from his home, to his wife and to Marian Virginia. At the time the letters were written neither the paternity of the child nor her right to claim under the will of J. H. Estill had ever been questioned by any member of the Estill family, so far as the record discloses. In his charge the court instructed the jury as follows: "The existence of a fact testified to by one positive witness is to be believed rather than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they did not see or know of its having transpired. This rule does not apply when, two parties having equal facilities for seeing or hearing a thing, one swears that it occurred, the other that it did not." The jury returned a verdict in favor of the plaintiffs. The defendants moved for a new trial, which was granted upon the ground that the court erred in giving the above-quoted instruction (30th ground of the motion). The plaintiffs sued out a writ of error, excepting to the judgment granting a new trial. The defendants, by cross-bill, excepted to the refusal of the court to grant them a new trial upon other grounds set out in the motion, and especially upon the grounds assigning error upon the ruling of the court in admitting evidence of the written and oral declarations of Marion W. Estill to the effect that Marian Virginia Estill was his child.

*W. B. Stubbs, G. N. Alford,* and *Oliver & Oliver,* for plaintiffs.

*Thomas P. Ravenel, Robert L. Colding,* and *Osborne, Lawrence & Abrahams,* for defendants.

HILL, J., dissenting. I dissent from the decision of the majority of the court, so far as the second division of the opinion is concerned. Whether the letters and declarations objected to are admissible in evidence depends upon whether they were written or made *ante litem motam*—before the origin of the controversy, or whether they were written or made *post litem motam*—after the controversy arose on the question at issue. The weight of authority is to the effect that declarations made by a reputed father or relative are admissible in evidence to prove pedigree, provided they are made without reference to any controversy which is about to arise as to such disputed fact. One of the earliest, and perhaps the leading case on the subject is that of William Fitzharding Berkeley, claiming as of right to be Earl of Berkeley, etc., reported in 4 Camp. 401. In that case it appeared that Frederick Augustus Berkeley, fifth Earl of Berkeley, died on August 8, 1810. During the same year the claimant presented a petition praying that a writ might be issued to summon him to parliament by the title of Earl of Berkeley as eldest son of the late Earl, by Mary, Countess of Berkeley. The petition was referred to the House of Lords. The petitioner alleged that his father and mother were married in the parish of Berkeley in the county of Gloucester, on the 30th of March, 1785. They were likewise married in the parish of St. Mary Lambeth on the 16th of May, 1796, till which time Lady Berkeley did not appear as his lordship's wife. The claimant, William Fitzharding Berkeley, was born before the second marriage, and was not until sometime after the second marriage treated as their legitimate son. They had several children after the second marriage. The question to be decided in that case respected the legitimacy of the claimant, and that depended upon the reality of the first marriage alleged to have taken place between his parents. The Earl of Berkeley was one of the witnesses examined by interrogatories for the plaintiff, and in his depositions he swore positively to the reality of the first marriage and the plaintiff's legitimacy. Counsel for the claimant, after other evidence adduced, proposed to read this deposition as a declaration by the Earl of Berkeley as to the matter of pedigree respecting the legitimacy of his son. The admissibility of this evidence was objected to, and upon the question being submitted it was held that the deposition could not be received as evidence of the declarations of the alleged

father as to the matter of pedigree. In delivering one of the opinions Bayley, J., said: "But the father may have views of his own, and a personal interest to serve by establishing the legitimacy of his eldest son. His eldest son may be of an age to cut off an entail, which cannot be done by means of the younger. There may be various other considerations in point of interest to influence the father, which if exhibited by cross-examination might in a great degree impeach, if not completely destroy, the effect of the evidence he has given. So it might turn out on cross-examination that he had made other contrary declarations, perhaps equally solemn as those to which he has been asked, and that his conduct towards his children and towards other persons had been such as to throw an entire discredit on his present asseverations. The learned judge then made some observations on the case of White-locke *v.* Baker, 13 Ves. 511, and Goodright *v.* Moss, Cowp. 591, and concluded by submitting it to their lordships as his opinion, that the depositions of J. S. as evidence of declarations in the matter of pedigree ought not to be received." Wood, B., in the same case said: "The admission of hearsay evidence of the declarations of deceased persons in matters of pedigree is an exception to the general law of evidence; and it has ever been received with a degree of jealousy, because the opposite party has had no opportunity of cross-examining the persons by whom the declarations are supposed to have been made. But declarations to be received in evidence, as I have always understood, and as was said in the case of Whitelocke *v.* Baker, must have been the natural effusions of the mind of the party making them, and must have been made on an occasion when his mind stood in an even position, without any temptation to exceed or fall short of the truth. Upon this principle it has been the general rule, as far back as my experience and knowledge go, to reject hearsay evidence of the declarations of deceased persons, not only relative to matters in actual suit, but in dispute and controversy prior to the commencement of judicial proceedings. Though such declarations may in some instances be founded in truth, I have always understood it to be a general rule to reject them because of the possibility, nay probability, that they may have been made to serve one or other of the contending parties." Also in the same case Mansfield, C. J., said: "In England, where the jury are the sole judges of the

fact, hearsay evidence is properly excluded, because no man can
tell what effect it might have upon their minds. (*a*) To the
general rule, with us, there are two exceptions; first, on the trial
of the rights of common and other rights claimed by prescription;
and secondly, on questions of pedigree. With respect to all these,
the declarations of deceased persons, who are supposed to have had
a personal knowledge of the facts, and to have stood quite dis-
interested, are received in evidence. In cases of general rights,
which depend upon immemorial usage, living witnesses can only
speak of their own knowledge to what has passed in their own time;
and to supply the deficiency the law receives the declarations of
persons who are dead. There, however, the witness is only allowed
to speak to what he has heard the dead man say respecting the
reputation of the right of way, or of common, or the like. A
declaration with regard to a particular fact, which would support
or negative the right, is inadmissible. In matters of pedigree, it
being impossible to prove by living witnesses the relationships of
past generations, the declarations of deceased members of the
family are admitted; but here, as the reputation must proceed on
particular facts, such as marriages, births, and the like, from the
necessity of the thing, the hearsay of the family as to these partic-
ular facts is not excluded. General rights are naturally talked
of in the neighborhood; and family transactions among the rela-
tions of the parties. Therefore, what is thus dropped in conver-
sation upon such subjects may be presumed to be true. But after
a dispute has arisen, the presumption in favor of declarations fails;
and to admit them would lead to the most dangerous consequences.
Accordingly, I know no rule better established in practice than this,
that such declarations shall be excluded. With respect to questions
of prescription, I have known many instances in which the rule
has been acted upon. I never heard the contrary contended either
as counsel or judge. I think the rule is equally applicable to ques-
tions of pedigree; and the violation of it here would be still more
alarming. There is no difference between the declarations of a
father, and those of any other relative; and if the declarations of
a father after the suit has begun be receivable, so must the declara-
tions of all related to the parties, whatever their station in society,
and whatever their private character. I do not feel that much
mischief is likely to arise from such declarations being rejected.

This question supposes J. S. to be the reputed father; and evidence of reputation must previously be given aliunde' to render the declaration admissible. If the father is proved to have brought up the party as his legitimate son, this is sufficient evidence of legitimacy till impeached, and indeed it amounts to a daily assertion that the son is legitimate. On principle I think the evidence inadmissible. The weight of authority I think inclines to the same side. In the famous Douglas Cause hearsay evidence of all sorts was received, but that cause was tried by the law of Scotland, according to which it. was receivable. In the Anglesea Cause many declarations of deceased persons were given in evidence; but after an attentive examination I cannot find that any of these had been made after the dispute had occurred. I myself took a note at the time of the case before Lord Camden, which states that on a question of the legitimacy of the son, the declarations of the mother as to her marriagé, made after the commencement of the suit, were received after objection taken and debate had; but not a word appears to have been said of the prior decision of Lord Chief Baron Reynolds. Had it been cited, I make no doubt that I should have enriched my store of notes with some account of it. In Goodright *v.* Moss, the objection to the answer that it was post litem motam does not seem to have been taken; and upon examination it will be found that the new trial was granted on the ground that the general declarations of the father and mother had been rejected. I am not aware of any other authority upon the subject in our law; but the distinction of declarations ante litem motam, and post litem motam, is clearly taken in a foreign treatise of great learning, entitled De Probationabus. I have now only to notice the observation, that to exclude declarations you must shew that the lis mota was known to the person who made them. There is no such rule. The line of distinction is—the origin of the controversy, and not the commencement of the suit. After the controversy has originated, all declarations are to be excluded, whether it was or was not known to the witness. If an inquiry were to be instituted in each instance, whether the existence of the controversy was or was not known at the time of the declaration, much time would be wasted, and great confusion would be produced. For these reasons I conceive that the deposition now offered in evidence is not admissible."

In Greenleaf on Evidence it is said: "Declarations made during the course of a legal controversy are to be regarded as lacking in the guarantees of trustworthiness; it is generally conceded that declarations made post litem motam are inadmissible. To have this effect, the dispute must have been upon the very point in controversy, though there is room for much latitude in applying this limitation. On the other hand, it is immaterial whether litigation had actually begun, if the controversy existed." 1 Greenleaf on Evidence (16th ed.), § 114 e, pp. 201, 202.

Prof. Wigmore (2 Wigmore on Ev. § 1484) says: "The existence of a controversy is only one circumstance (though the most common one) likely to produce a bias fatal to the trustworthiness of the declaration. Judicial opinion seems to hold, and properly, that other considerations may under certain circumstances operate to exclude the declarations. In general, they would be excluded where there is any specific and adequate reason to suppose the existence of a motive inconsistent with a fair degree of sincerity. In Lord Eldon's words, they must appear to be the natural effusions of a party standing in an even position."

In Byers v. Wallace, 87 Tex. 503 (28 S. W. 1056; 29 S. W. 760), the Supreme Court of Texas held: "The declaration of the father of the plaintiff W., that he had a nephew who went to Texas, and was killed in 1836, at what was known as the 'Fannin Massacre,' was inadmissible, because it established the declarant to be the sole heir of the deceased, and was contrary to the rule that the statement must be such as is not under the influence of any interest that would be active in inducing the declarant to depart from the truth." Brown, J., after citing a number of authorities, said: "In pedigree, matters of public interest, and ancient boundaries, the law excludes declarations of all persons made post litem motam, because it presumes that even that interest one may feel in the success of his friend might bias the statement, and deprive it of its value as a statement impartially made." There can be no rational distinction between a case where a declarant manufactures evidence for himself, and where he manufactures it for the benefit of a friend who is to profit by it after his death. In either case the evidence, if made post litem motam, must be excluded as being self-serving. In Monkton v. Attorney-General, 2 Russ. & Mylne, 147, where the question of pedigree

was involved, it was said on pages 160, 161, by the Lord Chancellor (Brougham) : " One restriction, however, clearly must be imposed : the declarations must be *ante litem motam*. If there be lis mota, or anything which has precisely the same effect upon a person's mind with litis contestatio, that person's declaration ceases to be admissible in evidence. It is no longer what Lord Eldon calls a natural effusion of the mind. It is subject to a strong suspicion that the party was in the act of making evidence for himself. If he be in such circumstances, that what he says is said, not because it is true, not because he believes it, but because he feels it to be profitable, or that it may hereafter become evidence for him, or for those in whom he takes an interest after his death, it is excluded, both upon principle and upon the authority of the cases, and among others of Whitelocke *v.* Baker. There is a still more distinct authority in the Berkeley Peerage case, where Mr. Justice Lawrence adopts almost the very language of Lord Eldon in Whitelocke *v.* Baker, and where, proceedings in equity having been instituted to perpetuate testimony, evidence of declarations was rejected upon the ground of litis contestatio. . . It was then askèd, as an argument for a further restriction of the rule, 'If a man may sit down to frame a pedigree, how can you receive that pedigree in evidence like an ordinary declaration, when, non constat, he may not have been in the act of making evidence for himself, by preparing a document which would afterwards profit him, or those in whom he is interested?' To that I answer, shew me that the pedigree in question was prepared with that view. Bring it within the rule of either Whitelocke *v.* Baker or of the Berkeley Peerage case; prove that it was made post litem motam, not meaning thereby a suit actually pending, but a controversy existing, and that the person making or concocting the declaration took part in the controversy; shew me even that there was a contemplation of legal proceedings, with a view to which the pedigree was manufactured; and I shall then hold that it comes within the rule which rejects evidence fabricated for a purpose, by a man who has an interest of his own to serve. The question then always will be (and so far I agree with the argument of the Crown), was the evidence in the particular circumstances manufactured, or was it spontaneous and natural ? If I thought that this came within the description of manufactured evidence, manufactured for a

purpose connected with the present controversy, I should of course at once have rejected it."

Thus it will be seen that the doctrine of post litem motam extends not only to those who have a personal interest in the controversy, but if the declarations are made in the interest of those in whom the declarant takes an interest after his death, such statements are to be excluded. This does not change the general rule as to proving pedigree by hearsay evidence, as provided by our statute, nor the rule which prevents living, interested witnesses from testifying, for in that case they can be cross-examined. § 5764 of the Civil Code is as follows: "Pedigree, including descent, relationship, birth, marriage, and death, may be proved either by the declarations of deceased persons related by blood or marriage, or by general repute in the family, or by genealogies, inscriptions, 'family trees,' and similar evidence." But this section is subject to the qualification that the declaration must have been made *ante litem motam*. *Mobley* v. *Pierce*, 144 *Ga.* 327. § 5768 of the Civil Code provides: "The declarations and entries of a person, since deceased, against his interest, and not made with a view to pending litigation, are admissible in evidence in any case." The converse of this proposition is equally true. Therefore, if such declarations were made with a view to a pending controversy and in the interest of declarant's friend, they should be excluded.

In the case of *Mobley* v. *Pierce,* supra, this court held: "Declarations of deceased persons, related by blood or marriage to the family in question, are admissible in matters of pedigree, but before such declarations are receivable in evidence the relationship of the declarant with the family must be established by some proof independent of the declaration itself. The foregoing rule is further qualified in that the declaration must have been made ante litem motam." This ruling is in accord with the general weight of authority in outside jurisdictions. In the *Mobley* case, supra, the Supreme Court of Georgia cites § 5764 of the Civil Code, and puts a construction on our statute with reference to proving pedigree in consonance with the authorities cited in this opinion and numerous others of like import. Such proposed testimony should be free from suspicion. 2 Wigmore on Ev. § 1482, and notes.

In view of the foregoing authorities, how stands this case? **At**

the time of the probate of the will of John H. Estill, Marion W. Estill, the writer of the letters objected to as evidence, had been married ten years, and had no children by his wife Elizabeth Pate Estill; and there was evidence tending to show that it was impossible for her to bear children. Under the terms of item 8 of the will of his father, Marion W. had only the income from a one-sixth interest bequeathed to him during his natural life for the support of himself and the support and education of his children, should he leave any, until their majority, when it was to be theirs absolutely. His wife took nothing under the will. The interest of Marion in the estate terminated at his death; and if he left no child or issue of child surviving him, the share bequeathed to him was to be equally divided between the distributees of the other five-sixths interests, as provided in the will. If he left children, the principal was to be equally divided between them when the youngest child attained the age of twenty-one years. The motive, therefore, was present for adopting a child as his own, so that his widow, who took nothing under the will, and who, so far as the record discloses, had no separate estate of her own, could handle, as natural guardian of the alleged child, her remainder interest in the estate until she arrived at twenty-one years of age, and then under the will her interest, whatever it was, could be shared by her mother. But it is argued that Marion had no interest in the estate after his death, and therefore no motive or interest in manufacturing testimony. As already pointed out, his widow was without property, and this he knew; and as Lord Chancellor Brougham well said in the Monkton case, supra, if the declarant made statements, not because they were true, not because he believed them, but because he felt it to be profitable, or that they might become evidence for him, *or for those in whom he took an interest, after his death,* the evidence is excluded. Besides, Marion had no property of his own that he could leave his wife and thus provide for her. In the instant case the declarant doubtless loved his wife, for he so expressed himself repeatedly in his letters; and after the adoption of the child, if it was adopted, he doubtless loved the child, and he so declared. In one of the letters to his wife he said: "Yes, dear, I love you and baby, and nobody else." He doubtless wanted to see both provided for, so far as he could after his death, and therefore the powerful motive for making the declarations as

to the child's paternity, subsequently to the origin of the controversy; and if so made they should not be received as evidence. Such declarations, in order to be admissible, as before observed, must be above suspicion. A reading of the entire record in this case will result in causing a strong suspicion as to the motive for this evidence; and if it does, under the authorities cited, it must be excluded. The fact that every letter was written and preserved is suspicious in view of the circumstances. Dr. Stothart, who had been the family physician, and who was a witness in the case, and to whom some of the letters objected to were written, and who had been the confidential friend and financial agent of Marion W. Estill, was asked on the trial if he had ever discussed with Mrs. [Elizabeth Pate] Estill and Marion W. Estill the terms of the will of Col. John H. Estill, as to where the income to "Joy Estill [Marion W.] would go after his death in the event he did not have a child," "whether it would revert to the other heirs." He answered, "Yes, we talked about it. I possibly talked to Mr. Estill and Mrs. Estill—maybe both." This witness also testified that he was "on intimate terms with Mr. and Mrs. Estill," and he declares that the matter of the will, and whether the legacy left to "Joy" [Marion] Estill would revert to the other heirs after his death without his leaving a child or children, was discussed. Here, then, is evidence that Marion had discussed the matter, and a powerful motive is shown for the adoption of a child, and making statements with reference to her in the interest of the wife, or widow, of Marion Estill, and the child after his death; and the rule excluding statements as to pedigree made post litem motam, as already shown, extends not only to the person making the declarations in his own favor, but to declarations made in the interest of those in whom he takes an interest after his death.

Under the principle ruled in the foregoing authorities it was error to admit in evidence the letters and declarations of Marion Estill, since deceased. See, beside the authorities already cited: 1 Gr. Ev. (16th ed.) 217 § 131; Walker v. Countess of Beauchamp, 6 C. & P. 552, 561; Elliott v. Peirsol, 1 Pet. 328 (3) (7 L. ed. 164); Rollins v. Wicker, 154 N. C. 559 (70 S. E. 934); Monkton v. Attorney-General, 2 Russ & Mylne, 147.