HINES *v.* DONALDSON, trustee, *et al.*

No. 13996.  APRIL 16, 1942.

*Wilkes T. Thrasher, J. M. C. Townsend,* and *Wright & Willingham,* for plaintiff in error.

*Matthews, Owens & Maddox, Leon & Dean Covington, Barry Wright, Henry J. Fullbright Jr.,* and *Dudley Magruder Jr.,* contra.

REID, Chief Justice. Earl Donaldson as trustee for his minor son, Harry Earl Donaldson, under a deed from Mrs. L. E. Donaldson, brought his suit seeking partition of certain realty, appointment of a receiver, etc., naming as defendants various parties claiming an interest in the realty by inheritance or purchase. He alleged that such minor was a grandson of Alexander Dougherty Sr., whose will was probated in 1903, and that under the terms of item six thereof the testator gave to Mrs. Medora Howland for and during her natural life certain described realty in Rome, Georgia, with the provision that at the death of Mrs. Medora Howland the said realty should go "to such of her children as survive her and to the representatives of such as may be dead, these latter taking in place of the deceased parent." The deed under which the minor claimed and the pertinent provision of the will were

made fully to appear and are not drawn in question. It was alleged that Mrs. Medora Howland had two children, but neither of them had any issue, and both of them had died. As to one of the defendants, Mrs. Eloise Howland Hines, the plaintiff alleged: "Mrs. Hines claims that she is either a daughter or adopted daughter of the said Mrs. Howland, and is now entitled to the property described in item six of the will of Alexander Dougherty Sr., . . and for this reason the said Mrs. Hines is made a party hereto. However, plaintiff alleges on information and belief that she is not entitled to any right, title, interest or claim in or to said property." The plaintiff prayed, among other things appropriate to the character of relief sought "that the interests of the various parties in and to said property be determined and fixed by a proper judgment and decree entered in the cause; . . that all of the defendants hereto be required to set up their respective rights and interests in and to such property." In her answer Mrs. Hines set out: "This defendant is a daughter of the said Mrs. Medora Howland. This defendant admits that she is the daughter of the said Mrs. Howland by blood, and that she is now entitled to the property described in item six of the will of Alexander Dougherty Sr., referred to in said paragraph, and is entitled to the entire fee-simple ownership in all of said property." By amendment she alleged: "That some two months ago, however, it came to her knowledge that she was known among some members of the family as actually being the granddaughter of Mrs. Howland, her mother having been Mamie Howland, a daughter of Mrs. Medora Howland, she having been taken by Mrs. Medora Howland as an infant and raised as her own child. That by reason of these facts coming to her knowledge she is unable to say in reality she is the daughter or the granddaughter of Mrs. Medora Howland, but this defendant shows that she is either the daughter or granddaughter of the said Mrs. Medora Howland, and that she is entitled to the property described in item six of the will of Alexander Dougherty, referred to in said paragraph, and is entitled to the fee-simple ownership in all of said property."

Only one issue was submitted to the jury, it being in the form of two questions propounded, as follows: "1. Is Mrs. Eloise Howland Hines the legitimate daughter or granddaughter of Mrs. M. E. Howland? You will answer that question 'Yes' or 'No' as you

find the fact to be. 2. If you answer the foregoing question 'Yes,' then state whether you find her to be the daughter or the granddaughter as you may find the fact to be. If you should answer the first question 'No,' then you need not answer this question." The jury answered the first question "No."

At the conclusion of the evidence one of the two counsel for Mrs. Hines requested the court to allow him or his associate to argue immediately preceding the concluding argument of counsel for the plaintiff. The court ruled that one counsel for Mrs. Hines should argue after the opening argument, and the other one before the closing argument. Whereupon counsel for the plaintiff stated that he waived his concluding argument in favor of counsel for one of the defendants other than Mrs. Hines. To this counsel for Mrs. Hines objected. The court stated that counsel for the plaintiff could designate who should have the concluding argument for him. This was objected to by counsel for Mrs. Hines, on the ground that it would be highly prejudicial to the rights of the defendant to have one of the codefendants in the case conclude the argument. At that juncture counsel for one of the codefendants other than Mrs. Hines stated that he originally represented one of the codefendants, Mrs. Mebane, and since her rights were identical with those of the plaintiff he had been retained, along with counsel for the plaintiff, to present the case to the jury, and that he would like to have permission to argue in conclusion "on behalf of the plaintiff in this case." The court overruled the objection of Mrs. Hines' counsel, stating that "the plaintiff would have a right to designate who should conclude the argument for the plaintiff."

Besides the general grounds of the motion for new trial filed in behalf of Mrs. Hines, the questions before us arise from three special grounds, in two of which complaint is made in respect to admission and rejection of testimony, and in one exception was taken to the order of argument of counsel permitted by the judge.

With the exception of one witness who undertook to give direct testimony as to the identity and pedigree of Mrs. Hines, the remaining evidence for the most part came from Mrs. Hines and members of the family of Mrs. Medora Howland, who was the daughter of Alexander Dougherty Sr. The court and all counsel in the case treated it as one where resort might be had to the

provisions of the Code, § 38-303, respecting proof of pedigree, etc.; and accordingly various witnesses testified as to declarations of members of the Howland and Dougherty family on the question whether Mrs. Hines was either the daughter or granddaughter of Mrs. Howland. The plaintiff and the defendants similarly interested sought to prove, by such declarations and by general repute in the family, that Mrs. Hines was not the daughter or the granddaughter of Mrs. Howland, but that instead she was the daughter of a Dutch maid who had worked in the home of the Howlands at a time when they lived in East St. Louis, Illinois, variously placed at some time about the year 1900, which would have been about the time of the birth of Mrs. Hines.

Earl Donaldson, the plaintiff, testified as follows: "As to whether or not Mrs. Medora Howland, who was a daughter of Alexander Dougherty Sr., left any children surviving her, well, no sir, she had two children, Rollie and Mamie, but they both died before Aunt Medora. Her husband is also dead. . . As to whether or not I know from my own knowledge that Eloise Howland Hines is the daughter of Aunt Medora Howland, well, Aunt Dora said she was the daughter of a Dutch maid that was left at her house in St. Louis. I have heard my Aunt Dora say that herself. . . It was way back there when they first came into Rome with her, and they were all talking about it, wondering who she was. . . My mother and Aunt Vi and Dabney were all talking about it. . . Aunt Medora was present several times when the child was discussed. Eloise Howland Hines was a very small child about four or five years old I would say. . . I was about ten or eleven years old at that time."

Mrs. L. E. Donaldson, the mother of Earl Donaldson, who was the daughter of Alexander Dougherty Sr., testified: "I had a brother named Alexander also. Alexander Dougherty's children besides myself, . . the oldest was Medora Howland, brother Alexander, Mrs. Viola Hill, and Alva Dougherty, and Dabney Dougherty. . . Mrs. Medora Howland was Medora Dougherty. . . They had two children. Their names were Rollie Howland and Mamie Howland. No, they are dead. Mrs. Howland did not leave any other children. Rollie Howland did not leave any children. Mamie Howland did not leave any children. . . I know a person named Mrs. Eloise Howland Hines. I did not

know whose child she was. She was not Medora Howland's child. She lived with Mrs. Howland. I do not know the relationship between them. . . She told the family it was the child of a Dutch maid, . . that she had run away and left the child somewhere, and she was raising the child through kindness and was attached to it that way; that it would keep her company; and that she was sorry for it. I heard her make these statements many times. I have talked to Mrs. Eloise Howland Hines. She said that Mrs. Howland was not her mother. Quite often she asked me who she was. She said she knew Mrs. Howland was not her mother. . . I don't know whose child she was at all. On occasions I haven't told her she was Mamie's child. I haven't on occasions told her that she was the child of different people. The general reputation and understanding in the family was that Mrs. Howland only had two children, Rollie and Mamie, and that they died before she died."

Other testimony from members of the family was of this same general import, but for the most part it consisted of repetition of statements alleged to have been made by Mrs. Medora Howland during her lifetime. Mrs. Hines testified that she had been brought up in the home of Mrs. Howland on the general belief and understanding that she was her daughter, and had continued so to live with Mrs. Howland even after her marriage and until Mrs. Howland's death. She denied that it had been told to her by other members of Mrs. Howland's family that she was a daughter of a Dutch maid, and denied having so stated to others.

Mrs. Willie Dougherty testified that it was her information from members of the family that her sister-in-law, Mrs. Howland, had only two children, Rollie and Mamie, both of whom were dead, but that she had known Mrs. Hines since she was small, and that Mrs. Hines was supposed to have been born in Birmingham at a time when Mrs. Howland lived in Rome, and that she was supposed to be the child of Mamie; that is, Mrs. Howland's daughter. She had given such testimony at the taking of depositions before the trial of the case, and after the taking of this testimony Mrs. Hines filed her amendment setting forth in effect that if she were not the daughter of Mrs. Howland she was the granddaughter.

Introduced in evidence were written statements made during her lifetime by Mrs. Howland, to the effect that she had only two

children, Mamie and Rollie, and that Mrs. Hines was not her daughter, but had been left with her when she was about three months old. Other witnesses of the family referred to Mrs. Hines as being and having been considered the adopted daughter of Mrs. Howland. The witness who professed to give direct evidence was one Fred Calvert, who testified for Mrs. Hines, that he lived in East St. Louis, Illinois, about 1900, when he was about nine years old; and that he knew the family of Mr. and Mrs. Howland, his family living on the same street and across the street from them. His recollection was that a child was born to them about that time, and that his mother, now deceased, and a named doctor, also deceased, had assisted at the birth of the child.

Several persons were permitted to testify without objection, and one over objection, which will be discussed in this opinion, as to statements having been made to them by members now deceased of the Howland and Dougherty families which referred to what Mrs. Howland herself had said respecting the parentage of the child, Mrs. Hines.

█ In one of the grounds of the motion for new trial it is complained that counsel for one of the defendants other than Mrs. Hines was permitted to make the concluding argument in the trial, the right to the concluding argument having been waived by counsel for the plaintiff, who by virtue of having the burden in the case, would normally have been entitled to it. It may be said as to this complaint that the judge on the beginning of the trial, after inspection of the pleadings, determined that the alignment of the parties was controlled by the issue whether or not Mrs. Hines was "either the legitimate daughter or granddaughter" of Mrs. Medora Howland, deceased. If she was related as daughter or granddaughter, she would be entitled to the property in question; otherwise she would not. There was no contention on the trial that there was any actual or virtual adoption which would entitle Mrs. Hines to the property involved, on the basis that she was a surviving child of Mrs. Howland; nor was any issue presented as to the respective interests of the other parties if they were let in to participate at all by reason of the exclusion of Mrs. Hines. So, although others besides Mrs. Hines were nominal defendants, the issue was clearly between Mrs. Hines and all the others. It was Mrs. Hines against the field. The burden on that issue had been placed by the court upon the plain-

tiff, and he had not objected to it. It is not claimed in behalf of Mrs. Hines that her counsel was entitled to the concluding argument, but rather that the effect of allowing one of her nominal codefendants to make the concluding argument tended to unduly prejudice her position in the trial.

The right to the concluding argument is and has always been regarded as vital and valuable; and when claim is made that it has been wrongfully withheld from a party in litigation, the courts will readily inquire into it. *Massengale* v. *Pounds,* 100 *Ga.* 770 (2) (28 S. E. 510). But if, as in the present case, parties appear nominally on one side, when on the only issue involved their interests are actually and wholly on the other side, the distribution of the privileges of argument is usually a matter within the sound discretion of the judge. 64 C. J. 246, § 263. It may be further observed in the present case that the lawyer permitted to make the concluding argument not only represented one of the defendants having interests opposed to Mrs. Hines and coinciding with the plaintiff, but at the time of accepting the waiver from counsel for the plaintiff he stated that he had been also retained by the plaintiff to make the argument in conclusion. The plaintiff's counsel concurred in this statement. In the circumstances we find no error in the action of the court.

■ In another ground complaint is made of the admission of certain testimony of a witness, H. H. Hill, who was the husband of Mrs. Viola Dougherty Hill, at the time of the trial deceased, she being a sister of Mrs. Howland. In the course of Mr. Hill's testimony, the question was asked him, "Did you later find out whose child she was?" He began to answer the question in this way: "Only what Mrs. Hill told me." Whereupon the objection was made: "We object to anything Mrs. Hill said with regard to the relationship of the child. It is of the general reputation in the family." This objection was overruled, and Mr. Hill was permitted to testify that his wife, Mrs. Hill, had told him that Mrs. Howland during her lifetime had told her and her mother that Mr. Howland was the father of the child, and that the child's mother was a maid. The objection urged in the motion and before us is that the admission of this testimony violated the rule as to hearsay testimony, the point being made that a declaration by Mrs. Hill as to what Mrs. Howland told her could not be ad-

mitted either as a declaration of a person deceased or as general repute, and thus come under the exception to the hearsay evidence rule provided in the Code, § 38-303, as follows: "Pedigree, including descent, relationship, birth, marriage, and death, may be proved either by the declarations of deceased persons related by blood or marriage, or by general repute in the family, or by genealogies, inscriptions, 'family trees,' and similar evidence." It was under the terms of this section that the case was largely tried.

Hearsay evidence is that which does not derive its value solely from the credit of the witness, but rests mainly on the veracity and competency of other persons. The very nature of the evidence shows its weakness, and it is admitted only in specified cases from necessity. Code, § 38-301. Section 38-303, quoted above, provides one of the specified cases in which the general hearsay rule has been relaxed. Birth may be proved by general repute in the family. *Luke* v. *Hill,* 137 *Ga.* 159 (2) (73 S. E. 345, 38 L. R. A. (N. S.) 559). Relationship may be proved by evidence of what is the general repute on the subject in the family. *Lamar* v. *Allen,* 108 *Ga.* 158, 162 (3) (33 S. E. 958). It is competent for a caveatrix to support a contention that she was next of kin of the decedent, by proving declarations to that effect made by the latter while in life. *Malone* v. *Adams,* 113 *Ga.* 791 (39 S. E. 507, 84 Am. St. R. 259). See *Massell Realty Co.* v. *Hanbury,* 165 *Ga.* 534 (8), 536 (141 S. E. 653); *Wilson* v. *State,* 173 *Ga.* 275, 276 (5 *a*) (160 S. E. 319). Although the rule on pedigree evidence has been defined and is contained in every Code, including the Code of 1863, applying the test suggested in *Brown* v. *Brown,* 184 *Ga.* 827, 830 (193 S. E. 754), it is not of statutory origin, but it has its roots in the beginnings of the English law. In Clement *v.* Packer, 125 U. S. 309 (8 Sup. Ct. 907, 31 L. ed. 721), the Supreme Court of the United States speaking of the general rule on hearsay said: "In Mima Queen *v.* Hepburn, 7 Cranch, 290, 296 (3 L. ed. 348), Chief Justice Marshall says: 'To this rule there are some exceptions which are said to be as old as the rule itself. These are cases of pedigree, of prescription, of custom, and in some cases of boundary. . . Also matters of general and public history.'" In *Foster* v. *Brooks,* 6 *Ga.* 287, 293, this court in an opinion by Judge Nisbet said: "There are, however,

some exceptions to the rule that hearsay evidence must be excluded. Proof of pedigree is one" (citing numerous English cases). Because it is a relaxation of the general fixed rules of evidence, there is perhaps less uniform precedent for its application than is true with reference to the rule itself, and to other well-established rules of evidence. For that reason, much has been written on the subject by various text-writers, reference to much of which may be found from the notes to § 468 of 20 Am. Jur., and some of which may be found developed by Justice Lumpkin in *Terry* v. *Brown,* 142 *Ga.* 224 (82 S. E. 566). As to the nature, purpose, and usefulness of this exception to the rule, we quote the following from Am. Jur., supra: "A time-honored exception to the hearsay rule exists in respect of proof of matters of family history, relationship, and pedigree. Subject to limitations and restrictions, hereinafter noted, hearsay evidence in the matters of family tradition and of declarations of deceased members of a family is admissible as proof on genealogical and other issues connected with the history of the family. Evidence of this character is admitted because it is the best the nature of the case admits, and because greater evils are apprehended from the rejection of such proof than from its admission. At least, common reputation in a family is admissible to prove matters of family history, where no superior evidence is attainable, or in connection with superior evidence. Indeed, it has been held that declarations respecting pedigree do not stand upon the footing of secondary evidence, to be excluded where a witness can be produced who speaks upon the subject from his own knowledge. The rule of law which admits hearsay evidence in cases of this sort rests upon the presumption that the declaration or family tradition comes from persons who have competent knowledge with respect to the subject-matter of the declaration, and speak the truth with reference thereto. Since one point in favor of receiving hearsay evidence upon matters of family history is its reliability, one of the conditions upon which family tradition is received in evidence is that it emanate from a source within the family, and from persons having such a connection with the party to whom it relates that it is natural and likely that they can not be mistaken and will speak the truth. In the event it appears that the evidence offered does not emanate from such source, the presumption of the reliability of the source of information is rebutted

and the evidence becomes inadmissible. It is clear that before a declaration of a deceased person is admissible to prove pedigree, the relationship of the declarant, by either blood or affinity to the family in question, or a branch thereof, must ordinarily be established by competent evidence independent of the declaration itself. Only slight proof of relationship is required, however, as a foundation for the admission of hearsay evidence regarding pedigree. It will be observed that the rule above stated, which permits declarations to be admitted in respect of matters of family history, refers to the declarations of deceased persons. There is authority directly to the point that a declarant must be dead in order that his declarations be admissible in proof of pedigree. The rule which permits declarations to be received in proof of pedigree is limited further to the extent that the declarations must have been made ante litem motam and under such circumstances that the person making them could have no motive to misrepresent the facts. No particular form of statement is required to render a declaration as to pedigree admissible. It may be oral or written, such as a letter or a recital in a deed. Declarations concerning pedigree, to be admissible, need not be upon the knowledge of the declarant. Thus, evidence is admissible that a deceased member of the family said that he heard from others of his family the facts of family history which he stated. Furthermore, such declarations are admissible notwithstanding the declarant did not mention the source from which he derived his information."

To get fully at the meaning of the evidence objected to, it is perhaps necessary to consider the remaining portion of Mr. Hill's testimony in the light of that coming from others. It is conceded that under the general rules of evidence he would not have been permitted to testify as to what his wife during her lifetime had been told by another in the family. It is also conceded that declarations of Mrs. Hill herself as to the parentage of the person whose pedigree was involved would have been admissible as coming through the surviving husband. Various members of the Howland family, some related by blood and some by marriage, had already testified in the case. The nature of their testimony had related chiefly to what they had heard Mrs. Howland say in her lifetime about the parentage of Mrs. Hines, although we find in the record instances where the examination had been much more general, and

several witnesses had been permitted, without objection, to testify as to the substantive fact that Mrs. Howland had only two children, Rollie and Mamie. They were then, sometimes by direct questions and sometimes on cross-examination, asked different questions about what they had heard others in the family say. Some of these instances are as follows: Mrs. Willie Dougherty, on direct examination by counsel for Mrs. Hines, testified: "My information as to [Mrs. Hines'] parentage is based entirely on what Alex. told me his mother said. On what my husband told me his mother said." Earl Donaldson testified: "As to whether or not on yesterday I testified that there had ever been any discussions among the members of the family as to who Mrs. Hines' mother was, well, yes sir, whenever the family got together, that is two or three members of the family got together, they would finally get around to that question, and they were curious to know who the child was. Some members of the family said the child was Mamie's child." Gloria Hill testified: "We [Mrs. Hines and the witness] were just discussing the family together, my family and her family. As to what I mean by 'her family,' well she was in the family, but she was an adopted child. I do not know if she was legally adopted."

So, although there are two aspects of proof in the present case permitted under the Code section involved, that is, declarations of deceased persons of the family (as such in their own right), and "by general repute in the family," we can not but be impressed from an examination of the entire record, both as to that which had gone before the examination of Mr. Hill and that which followed, that counsel for all the parties had been seeking to establish "general repute" almost by whatever had been said at various times in the family, in the belief, we take it, that the sum of all these instances would tend to constitute a family repute to the effect that Mrs. Hines either was or was not the daughter or granddaughter of Mrs. Howland. That was the nature of the whole inquiry. When Mr. Hill was on the witness-stand, it was established from him that he was a member of the Howland-Dougherty family by marriage; that he had married Mrs. Howland's sister in 1897; it was developed from him the character of contact he had maintained with the family, including Mrs. Howland and others; his knowledge of the presence of Mrs. Hines from the time she was a child in the home of Mrs. Howland; he was fully examined

about an occasion in 1901 when he and his wife, and his daughter, just born, were there and when Mrs. Howland was there; he was permitted to testify, referring to Mrs. Howland, "She just had one daughter and one son." He was then examined about another occasion when he saw Mrs. Howland in 1903 at her father's funeral in Rome, and stated that at that time she had a little girl with her. Similarly, he testified about different other occasions while he was a member of the family.

Just preceding the question propounded to Mr. Hill which is now under investigation, he had testified: "As to whether or not I remember having any conversation with any of the members of my wife's family with reference to how many children Mrs. Howland had, well, only what Mrs. Hill told me that Mrs. Howland told her and her mother when they questioned her about this child. At that time they could not find out whose child it was, and they questioned Mrs. Howland about it. . ." Then followed the answer which is objected to in the record. After this testimony was admitted over objection and some other additional facts brought out, counsel for Mrs. Hines proceeded to cross-examine the witness about substantially all of the things to which he had testified on direct examination. He was asked about when it was his wife had made the statement now involved to him, and answered: "As to when it was that my wife told me that Mrs. Howland had told her that Mrs. Hines was the daughter of a Dutch maid, well, it was later, a year or two later." He further testified, on redirect examination: "As to whether or not the family ever discussed the relationship between Mrs. Howland and Mrs. Hines, well, the question was asked by Mrs. Hill and other members of the family as to whose child it was, and there was no reply made. The family was interested to know whose child it was, just like anybody would be interested to know when a stranger came in the family."

Shortly after Mr. Hill testified, his daughter took the stand, and among other things she testified, without objection: "I have heard my mother say that Mrs. Hines was the daughter of a maid in St. Louis, and that Mrs. Howland told her that." She also quoted Mrs. Hines herself as having told her that her mother, Mrs. Howland (the aunt of the witness), told her that she was the child of a maid in St. Louis.

We recognize that in establishing or offering proof of general repute in the family, the proper and perhaps in some instances the only method for doing so would be first to establish the knowledge of the person testifying as to general repute, and then by appropriate question provoke an answer which would in terms state what such repute was. Cf. *Powell* v. *State,* 101 *Ga.* 9 (29 S. E. 309, 65 Am. St. R. 277). From practice, however, we recognize difficulties arising from the strictest enforcement of such a rule. For instance, oftentimes a witness might be asked the question if he were familiar with the general repute in the family as to a given situation, and, being unfamiliar with the rules of evidence and the reasons behind them, would naturally be inclined to cite some specific instance of what some one in the family had said on the subject. In this connection, 5 Wigmore on Evidence (3d ed.), § 1482, p. 297, points out as to such sayings in the family: "1790, Ashhurst, J., in R. *v.* Eriswell, 3 T. R. 720: 'It is natural for persons to talk of their own situations and of their families. The evidence is in its nature of an unsuspicious kind; it is generally brought from remote times, when no question was depending or even thought of, and when no purpose would apparently be answered.' " In a case like this, it is a sharply drawn line that separates what amounts to "declarations" and what amounts to "general repute." Of course, in one sense every statement made by a member of the family makes it a contribution toward forming the general sum of family repute. Indeed, this kind of situation has led some text-writers to say, as we find in 1 Jones on Evidence in Civil Cases (4th ed.), 587, § 313: "If the declarations come from the proper source—that is, from legal relatives since deceased—they are admissible, although they consist of hearsay upon hearsay. . . Nor need the declarations be based upon the knowledge of the declarant; to require cognizance of the fact would defeat the main object to permitting this class of testimony," and as seems implied in what we have quoted from 20 Am. Jur. In *Garner* v. *Wood,* 188 *Ga.* 463 (4 S. E. 2d, 137), relied on by the plaintiff in error, the person whose declaration was rejected was in life; and besides, her declaration was post lite motam. Although we do not announce as a rule, or declare it to be the rule now of force, that in every instance the exception to the rule on hearsay would be extended so far as to permit an isolated statement of the character here under

attack, nevertheless, considering the nature of the objection made and the character of the other examination of the witness by all counsel, and the general character of the other testimony, the absence of objections in similar instances, we do not feel inclined to reverse the judgment in this case because of the admission of such testimony, and accordingly hold the ground without merit.

In another ground it is complained that the court erred in "ruling out the following material evidence," setting out that the defendant, Mrs. Eloise Howland Hines, who was on the stand and under direct examination by her counsel, was asked a question as follows: "At the time when Mr. Covington and Mr. Fullbright were in Birmingham, Alabama, at the home of Mrs. Willie Dougherty, and were there for the purpose of taking testimony by a deposition, at that time, I will ask you, what did Mrs. Dougherty tell you with regard to your not being the daughter of your sister, Mamie?" Counsel for the plaintiff objected to the question. Counsel for Mrs. Hines stated to the court it was for the purpose of explaining why the amendment to her answer was filed, setting up that she was either the daughter or the granddaughter of Mrs. Howland, and "It's merely for the purpose of explaining conduct." The objection to the question was sustained. It is not shown that the witness gave any answer, or that any evidence was ruled out, or that it was stated to the court what answer was expected. An exception to a refusal to allow a witness to answer a specified question asked on direct examination presents no assignment of error with which the court can deal, when it does not appear what answer was expected. *Powell* v. *Harrison,* 180 *Ga.* 197 (2) (178 S. E. 745) ; *Scott* v. *Mattox,* 113 *Ga.* 795 (4) (39 S. E. 500, 84 Am. St. R. 263) ; *Central of Ga. Ry. Co.* v. *Bond,* 111 *Ga.* 13 (2), 15 (36 S. E. 299). But if it be assumed from the nature of the question itself that the witness would have answered that Mrs. Willie Dougherty had stated to her that Mrs. Hines was the daughter of Mamie Howland, no such harm could have been sustained by Mrs. Hines as would constitute reversible error on the ruling of the court, because there is shown in the brief of evidence in the case other testimony of Mrs. Hines, unobjected to, as follows: "As to when was the first time I ever heard the question raised in this case that there might be a possibility that I was the granddaughter of Mrs. Medora Howland and the daughter of my

sister Mamie, well, I never heard of that until we were in Birmingham, taking the testimony of Mrs. Willie Dougherty, back some time this year. It was in December of last year or in January of this year. Mr. Covington and Mr. Fullbright and myself were in Birmingham, taking the testimony of Mrs. Willie Dougherty Jr.; and that was the first time I ever heard the question raised that I might be the granddaughter of my mother and the daughter of my sister, Mamie. And I will state that it was quite a shock that I might be the daughter of my sister Mamie, by my sister Mamie's first husband. I have since learned that is an incorrect statement, and that I am not the daughter of my sister Mamie and her first husband, but that I am the daughter of my mother, Mrs. Medora Howland." In this connection it may be further observed that when this question was propounded to the witness, counsel for Mrs. Hines stated to the court that it was being asked "for the purpose of explaining conduct," that is, as to why Mrs. Hines filed her amendment setting up that she was either the daughter or granddaughter of Mrs. Howland. In the circumstances, we must take it that the judge ruled on the question only in relation to the restricted purposes stated by counsel for Mrs. Hines, and our own consideration of, it need extend no further.

■ In the original brief it was conceded by counsel for the plaintiff in error that the evidence would have authorized a verdict for or against Mrs. Hines; but we have given full consideration to a supplemental brief in which they point out that upon further consideration, and upon a principle which will now be mentioned, they make the contention that there was no evidence to support the verdict. The theory upon which they make this contention is that the burden was upon the plaintiff to negative the parental relationship between Mrs. Hines and either Mrs. Howland or her daughter Mamie, and since, as they contend, all of the evidence received for that purpose or bearing upon that issue consisted solely of declarations made by Mrs. Howland during her lifetime, and since, as they contend, before such declarations would be admissible as such, it would be necessary to show by independent and direct evidence that Mrs. Hines was related by blood or marriage to the declarant, all such amount only to hearsay, and, while admitted without objection, have no probative value and do not sustain the

plaintiff's case under the burden put upon him. Whether the plaintiff was put upon a heavier burden than the law cast upon him we do not decide.

We have already somewhat observed, in division 2 of this opinion, the general nature of the proof as regards what portions of it would be classified as "declarations" and what portions "general repute." We think it unnecessary to do more than to keep this and a reference to our general statement of facts in mind in considering the general grounds of the motion.

In *Greene* v. *Almand,* 111 *Ga.* 735 (36 S. E. 957), the court ruled as follows: "Sayings of a deceased person can not be rendered competent evidence on a question of pedigree by merely proving that such person said he was a kinsman or relative of the person whose pedigree is the subject-matter of the inquiry. The fact of relationship must be shown by other evidence." This case was followed in *Terry* v. *Brown,* supra, where Judge Lumpkin, speaking for himself only as the writer of the opinion, observed that "in applying a correct general principle that decision fell into error, and is contrary both to sound reason and to the great weight of authority," proceeding thereupon with a somewhat extended discussion of the general question. Again in *Mobley* v. *Pierce,* 144 *Ga.* 327 (87 S. E. 24), the court was asked to overrule *Greene* v. *Almand,* supra, by reason of the criticism by Judge Lumpkin referred to. The observation was there made that "Even if the ruling in 111 *Ga.* should be modified as suggested in 142 *Ga.,* it would be of no service to the plaintiff, as no such point arises here." In the *Mobley* case, supra, it was pointed out that one source of the witness's information which it was held should be rejected came only from one Cooper, who sought to connect himself for the purpose of inheritance with the family of Taylor. It, of course, was recognized that declarations of Cooper in such a case would have no probative value, without extrinsic evidence establishing the fact that Cooper was a member of the Taylor family, and attention was called to the fact that no criticism had been offered of the proposition laid down by Judge Cobb in *Greene* v. *Almand,* supra, that the fact of relationship must be shown by other evidence, and Judge Lumpkin was quoted as saying: "Where statements of deceased persons are offered in evidence on the subject of pedigree, it is of course a general rule that there must be

some extrinsic evidence that such declarant was related to the family; but where the question is whether any, or what, relationship exists between two supposed branches of the same family, it is sufficient to establish the connection of the deceased declarant with either branch, in order to render such declaration admissible."

It is our opinion, upon a study of the cases from our own court and generally in the texts and other cases, that confusion has arisen over the meaning sometimes ascribed to the headnote in *Greene* v. *Almand,* supra. When this exact language is isolated and one undertakes to apply it to certain cases such as the present case, it would seem to state an unsound principle and one contrary to the general weight of authority and to almost all of the text-writers on the subject. In other words, in the present case, if the statement in this headnote should be held to require us to say that before declarations of Mrs. Howland could be received, under the Code section involved, for the purpose of establishing that she was or was not the mother of Mrs. Hines, it would be necessary first to establish that she was related by blood or marriage to Mrs. Hines. This, of course, would not do. It would be begging the question. In the present case Mrs. Hines claimed to be either the daughter or the granddaughter of Mrs. Howland. If she established the fact of either relationship, she would win her case. The whole trouble seems to have arisen from a consideration of which family is referred to, when the general authorities point out that the *relationship* must be first established before the declarations will be heard. The whole controversy in the instant case depended upon whose family Mrs. Hines belonged to, wholly different from a case where admittedly she belonged to one family and sought to establish relationship also with another. The nature of the objections to the testimony excluded in *Greene* v. *Almand* does not appear in the published opinion, but examination of the record shows that declarations of Mrs. Bagley and others seeking to connect the caveators with the family of John D. Floyd, deceased, were objected to on the ground that they were hearsay "and not shown to be declarations of a person related to John D. Floyd." It was sought to sustain them because the testimony of the witness, "taken in connection with the declarations of the intestate, John D. Floyd, that he had relatives in Virginia (and other circumstances) was competent to show that both witness

and the declarant William Floyd were related to the family of John D. Floyd, the intestate." What is said in the opinion, " 'Before such declarations, however, can be admitted, the relationship of the declarant to the family must be proved by other evidence than his declarations; for it would be a *petitio principii* to say that his declarations are receivable because he is a member of the family, and he is a member of the family because his declarations are receivable' 1 Whart. Ev. § 218. 'The *relationship of the declarant* with the family *must be established* by some proof *other than the declaration* itself.' 2 Taylor, Ev. § 640," would seem to show that it was meant only to apply the generally established rule that the identity and relationship of the declarant must be shown before his sayings could be heard on the subject of inquiry. We do not consider that the court in Judge Cobb's case meant to hold any such thing as is here contended. Testimony of this kind, as all the authorities recognize, is admitted only upon the rule of necessity. If the reason for its existence rests on practical sense, let its application be also practical.

Without going at length into various reasons which have been stated upon this view of the question, we think a good statement is found in 5 Wigmore on Evidence (3d ed.), §§ 1490, 1491. After discussion he crystallizes the rule in the statement that "Upon the general principle for testimonial knowledge (ante, § 654), the qualifications of the deceased declarant, his relationship, or whatever is relied upon as equipping him with information, *must be shown* in advance. In other words, the relationship of the declarant to the family whose history he refers to must be shown by evidence independent of his mere declaration; otherwise, there would be a begging of the question. . . It follows, in applying the foregoing principle, that where an alleged relationship between Doe and Roe is to be testified to, a relation of Doe may speak to it, because it concerns the relationships of Doe's family, while a relation of Roe may equally speak to it, because it concerns the relationships of Roe's family; hence, all that is required of the declarant is a *connection with either one or the other, but not with both.*" In 1 Elliott on Evidence, 479, we find: "So it seems that it is sufficient if the declarant is related to the family with which the person in question seeks to connect himself." See generally 1 Greenleaf on Ev. (16th ed.), 195-203, 22 C. J. 244. In Aalholm

*v.* People, 211 N. Y. 406 (105 N. E. 647, L. R. A. 1915D, 215), it was said: "In Jarchow *v.* Groose, 257 Ill. 36, 100 N. E. 290, Ann. Cas. 1914A, 820, the court makes a distinction between cases where an attempt is made to set up some right or claim to be derived through the declarant, and by the declarant's own statement to establish the right to share in the property of a family or individual to which he or she claimed to be related, and where it is sought to reach the estate of the declarant, such declarations, from the very necessity of the case, are admissible without extrinsic proof of the relationship thus declared."

As applicable to the present case, it may be observed that in *Estill* v. *Estill,* 149 *Ga.* 384 (100 S. E. 365), it was held that declarations of a reputed father, deceased at the time of the trial, might be received in evidence on the question of pedigree under the Code section here involved.

Counsel in the present case all seem to agree on the novelty of the case which brings in issue the question of who is a person's mother; yet no reason is offered as to why the same rule should not be applied in the case of the declarations of an alleged mother, as have been held good on the question of paternity. We see no reason to so hold. It seems to us safe to say upon our own responsibility, from the very nature of things, once recognition is given to the rule involved, that members of the Howland family (Mrs. Hines's identity and family connection being otherwise unknown) would be the very people from whom declarations should be received as to whether or not she was of that family.

We hold that there was evidence to support the verdict.

*Judgment affirmed. All the Justices concur.*